**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

|  |  |
|---|---|
| CYNTHIA PARHAM, JED OPPENHEIM, CHERYL GOGGIN, LEAGUE OF WOMEN VOTERS MISSISSIPPI, and MISSISSIPPI STATE CONFERENCE OF THE NAACP, | |
| Plaintiffs, | Civil Action No.  3:20-cv-572-DPJ-FKB |
| v. | |
| MICHAEL D. WATSON, JR., in his official capacity as Secretary of State of Mississippi; and LYNN FITCH, in her official capacity as Attorney General of the State of Mississippi, | |
| Defendants. | |

**COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs Cynthia Parham, Jed Oppenheim, Cheryl Goggin, League of Women Voters of Mississippi, and Mississippi State Conference of the NAACP (collectively, "Plaintiffs") bring this action for immediate injunctive and declaratory relief against Mississippi Secretary of State Michael Watson and Defendant Attorney General Lynn Fitch (collectively, "Defendants") for failing to protect Mississippi voters' fundamental right to vote during the COVID-19 public health crisis, including during the November 3, 2020 general election ("November election").

2.      The novel coronavirus, SARS-CoV-2, is the virus that causes COVID-19—an infectious disease that has spread throughout the world at a rapid pace.  The COVID-19 pandemic has created an unquestionable public health crisis that has disrupted—indeed, upended—all facets

1

of public life across the United States.  At the date of filing this Complaint, at least 79,206 people in Mississippi have contracted COVID-19 and 2,315 have died.

3.      Unfortunately, the toll of COVID-19 is steadily increasing—both in cases and in deaths—and public health officials have been clear that the crisis will continue, if not worsen, into the fall and winter.  Public health experts warn that the coronavirus will continue to pose a serious threat to public health and safety until a vaccine becomes available and have projected that it is highly unlikely that an FDA-approved vaccine will be mass-produced and widely available in time for the November election.

4.      Because the coronavirus spreads through close contact between individuals, public health experts recommend that people protect themselves by staying home and maintaining at least six feet of distance from people outside of their household.  Events that bring crowds of people together, particularly indoors, present high risk of mass transmission.  Social distancing guidelines have been implemented and encouraged by federal, state, and local governments to slow the spread of the deadly disease.  Indeed, many have recognized that it is the best, most effective tool for curbing the pandemic.

5.      COVID-19, therefore, poses a meaningful threat to in-person voters, especially those voters at higher risk of severe complications from COVID-19.  Mississippi's absentee voting eligibility requirements force those voters to face a potentially devastating choice: put their health (perhaps life) at risk or not exercise their fundamental right to vote.  Given the persistent and grave public health concerns, many Mississippi voters will be reluctant or unable to cast a ballot in person as long as the COVID-19 pandemic persists, including during the November election.  Defendants have failed to take necessary steps to protect Mississippi voters' fundamental right to vote despite the public health risks of voting in person during the COVID-19 pandemic.

6.      Voting absentee is available *only* to Mississippians who meet one of several excuses under Mississippi law.   Because of Defendants' actions and omissions, voters in Mississippi are confused as to whether they meet the absentee voting eligibility requirements if they reasonably fear that voting in person may increase their risk of exposure to COVID-19.   The complete lack of clarity exists even if voters have preexisting medical conditions that make them higher risk for COVID-19 and the severe complications that accompany the disease.   Defendants have exacerbated, not remedied, this confusion.

7.      Further, other aspects of Mississippi's absentee ballot law create unconstitutional burdens on Plaintiffs' right to vote and deny Mississippi voters due process under law.   The requirement that the voter's signature be notarized or signed by an official authorized to administer oaths is an untenable burden for any voters who fear contact with others may increase their risk of contracting the coronavirus.   Additionally, Mississippi's failure to provide notice of and an opportunity to cure ballots that have been rejected because of Mississippi's error-prone signature mismatch process threatens to unconstitutionally deprive thousands of Mississippians their right to vote.

8.      Accordingly, Plaintiffs challenge three components of Mississippi's election laws and regulations in the context of the COVID-19 pandemic (together, the "Challenged Requirements").

9.      *First*, Plaintiffs challenge Defendants' failure to advise voters unequivocally that, pursuant to the express language of the controlling statute, Mississippi's law allows voters to vote by absentee ballot if they reasonably fear that voting in person will expose themselves or others to the risk of contracting the coronavirus.

10.     This result should be obvious from the plain language of the governing law that allows voters to vote absentee if they are "unable to vote in person without substantial hardship to himself or others, or whose attendance at the voting place could reasonably cause danger to himself, or others." Miss. Code Ann. § 23-15-713(d).  The Mississippi Legislature also recently explicitly defined "temporary disability" to include voters subject to a "physician-imposed quarantine" or "caring for a dependent under a physician-imposed quarantine" due to COVID-19 for the remainder of 2020.  *Id.*  (referred to hereafter as "the Excuse Requirement").

11.     Despite the clear legislative intent to protect voters who are at risk of contracting coronavirus and exposure to COVID-19 by allowing them to vote by absentee ballot, Defendant Watson has refused to say that is so, and has failed to contradict statements by state officials that the statute's protections are significantly limited.  For example, the Governor of Mississippi has publicly stated Mississippi law does not allow for voters with comorbidities or fear of contracting the coronavirus to qualify for absentee voting, and Defendant Watson issued no response.  County election officials are still awaiting concrete instructions from Defendant Watson on processing absentee ballots in light of COVID-19 and the recent clarifications to the eligibility requirements under House Bill 1521 (HB 1521).

12.     Not surprisingly, Mississippi voters are in a state of confusion, burdened with the choice between potentially violating the law by requesting an absentee ballot to preserve their health or putting their health at risk by voting in person. This unconstitutional burden is not outweighed by any legitimate state interest.  Thus, Plaintiffs ask this Court to order Defendants to relieve this burden by publicly advising voters that Mississippi law allows all voters to vote absentee who reasonably fear exposure to COVID-19 if they vote in person.

13.     If the Court does not agree this result is mandated by the language of the statute, then Plaintiffs ask the Court to find in the alternative that Mississippi's absentee ballot law unconstitutionally burdens Mississippi voters during the COVID-19 pandemic.  Specifically, Plaintiffs seek an order from this Court declaring that Defendant's application of the Excuse Requirement violates Plaintiffs' fundamental right to vote when they are not allowed to vote by mail during the COVID-19 pandemic if they reasonably fear voting in person will increase their risk of exposure to COVID-19, and ordering Defendants to provide such remedy.  Plaintiffs also seek in the alternative a declaration that the statute governing eligibility for absentee ballots is unconstitutionally vague, and state officials have contributed to its vagueness with their conflicting statements as to the applicability of the law, and Plaintiffs ask this Court to construe the law so as to reach a constitutional result: that voters with a reasonable fear of exposure to COVID-19 if they vote in person may vote by absentee ballot.

14.     *Second*, Plaintiffs challenge Mississippi law requiring notarization or attestation from an official authorized to administer oaths to apply for an absentee ballot and to vote absentee under Sections 23-15-627 and 23-15-715 of the Mississippi Code (the "Notarization Requirement").  Complying with the Notarization Requirement places a significant burden on voters, particularly those at higher-risk for COVID-19 who have strictly socially distanced to protect their health, because it forces them to break self-quarantine *twice* to comply.  Plaintiffs ask the Court to declare that, under the circumstances of the COVID-19 pandemic, Mississippi's Notarization Requirement unconstitutionally burdens Plaintiff Goggin's and Organizational Plaintiffs' members' right to vote under the First and Fourteenth Amendments, and enjoin its enforcement for the duration of the COVID-19 pandemic

15.     *Third,* Plaintiffs challenge the lack of notice and opportunity to cure ballots rejected based on faulty signature match procedures under Section 23-15-641(1) of the Mississippi Code (the "Cure Prohibition"), which stands to disenfranchise voters who cast their ballot by mail.  Even if Mississippians are able to comply with each of these requirements, local election officials may still reject a voter's ballot if the official believes the voter's signature on the ballot envelope does not match the signature on the voter's absentee ballot application.  Signature match analysis is notoriously inaccurate, and voters must be given notice that their ballots have been rejected on that basis and an opportunity to cure the rejection.  Mississippi law does not provide either notice or an opportunity to cure.

16.     Because Section 23-15-641 fails to provide absentee voters with notice of and an opportunity to cure signature verification deficiencies, its process for counting absentee ballots is unconstitutional and deprives absentee voters of procedural due process in violation of the Fourteenth Amendment and their fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the First and Fourteenth Amendments to the U.S. Constitution.

18.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.  Plaintiffs bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the U.S. Constitution and federal law.

19.     This Court has authority to grant both declaratory and injunctive relief pursuant to § 2201 (authority to grant declaratory relief) and § 2202 (authority to grant relief ancillary to

declaratory judgment), in addition to its authority under the Civil Rights Act and its inherent equitable powers.

20.     The Court has personal jurisdiction over Defendants, who are sued only in their official capacity as officers and officials of the State of Mississippi.  The violations complained of concern their conduct in such capacity.

21.     Venue lies in the Southern District of Mississippi pursuant to 28 U.S.C. § 1391(b) because all Defendants are residents of Mississippi, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district.

## PLAINTIFFS

22.     Plaintiff CYNTHIA PARHAM is 61 years old, African-American, and a resident of Oxford, Mississippi.  She is a U.S. citizen and a lawfully registered Mississippi voter.  Ms. Parham lives with her husband, who is 62 years old.  Ms. Parham suffers from heart disease, diabetes, and kidney disease, and her husband suffers from pulmonary disease.  Because of these conditions, both Ms. Parham and her husband are at higher risk for contracting, suffering severe complications, and potentially dying from COVID-19.  Due to this increased risk, Ms. Parham has been limiting in-person interaction with individuals outside her family, avoiding contact with large groups, and using personal protective equipment when she must go out.  Ms. Parham only leaves her home for necessary errands and for work, where she only interacts with one employee and a small number of clients.  She maintains a strict six-foot distance between herself and all other persons at work, and everyone is required to wear a mask.  Surfaces are disinfected frequently. When Ms. Parham shops for groceries, she always wears a mask and stays six feet away from others.  Ms. Parham is a regular voter and usually prefers to vote in-person.  Because of her and her husband's health conditions, she will need to vote by absentee ballot during the COVID-19 pandemic, including the November election.  Ms. Parham believes that voting in-person at her

polling place presents a severe risk to her and her husband's health and life.  Ms. Parham understands that to vote absentee in Mississippi, she must qualify for an excuse.  Although the law was changed to allow people with a "physician-imposed quarantine," or who are caring for a "dependent" under a "physician-imposed quarantine" to request an absentee ballot, Ms. Parham is unsure whether she qualifies to select that or any other existing excuse.  If Ms. Parham cannot vote by absentee ballot, she will be forced to either vote in person—risking her health and her husband's health—or to not cast a ballot until the COVID-19 pandemic ends.  Ms. Parham is a dedicated, regular voter; she even ran for local office in March of 2020.  To not vote during the COVID-19 pandemic would be devastating to Ms. Parham.

23.     Plaintiff JED OPPENHEIM is 40 years old, white, and a resident of Jackson, Mississippi.  He is a U.S. citizen and a lawfully registered Mississippi voter.  He lives at home with his wife, Harriett Oppenheim, who is 37 years old and a registered voter, and their one-year-old son.  Mr. Oppenheim's wife has health conditions that put her at higher risk of contracting and suffering severe complications, and potentially dying from COVID-19.  She has lupus, meaning she is immunocompromised; high blood pressure; and is a kidney transplant recipient after renal failure.  If anyone in the household tests positive for COVID-19, it is likely that Harriett would need to go immediately to the hospital.  Harriett's 69-year-old mother is also part of their family unit, although she does not physically live in the same house.  Mr. Oppenheim visits his mother-in-law to bring her grocery items, take her mail, and drop off his son for childcare a few times a week.  His mother-in-law has moderate asthma, which makes her higher risk for contracting and suffering severe complications and potentially dying from COVID-19.  Because of the risk COVID-19 poses to his family's health, Mr. Oppenheim limits his outside activity and avoids contact with anyone outside his family unit.  When he must leave the house for necessary errands

or appointments, he always wears a mask and gloves.  Mr. Oppenheim is a lifelong, regular voter.

He usually votes in-person on Election Day and prefers to do so.  He plans to vote in all upcoming

elections in Mississippi, including the November election, but because of the severe risk that

voting in person poses to his wife's life and his mother-in-law's health, Mr. Oppenheim must vote

by absentee ballot.  Yet, Mr. Oppenheim understands that although there is a new law providing

an excuse on the application for an absentee ballot relating to COVID-19 for the November

election, it is not clear that he qualifies for that excuse.  Mr. Oppenheim sought clarity from the

Secretary of State regarding his eligibility to vote by absentee ballot but has not received a

response.  If Mr. Oppenheim is unable to vote by absentee ballot, he will have to decide whether

to vote in person—risking the health of his family and possibly even the life of his wife—or not

vote at all.  If he is forced to vote in person, risking his wife's life and mother-in-law's health, he

will need to take substantial safety measures to protect himself from contracting coronavirus at the

polling location; these include wearing personal protective equipment, maintaining 6-foot

distance, and sanitizing his hands after touching any surfaces.  After voting, he will need to self-

isolate away from his child and wife, potentially at a costly hotel or motel, until he tests negative

for COVID-19, which could take weeks.  During this time, he will not be able to care for and run

essential and emergency errands for his family.  Being forced to vote in-person will significantly

disrupt his family's lives.

24.     Plaintiff CHERYL GOGGIN is 72 years old, white, and a resident of Hattiesburg,

Mississippi.  She is a U.S. citizen and a lawfully registered Mississippi voter, and is also a member

of the Pine Belt chapter of the League of Women Voters of Mississippi.  Ms. Goggin lives alone

in her home in Hattiesburg.  She is a retired art history professor and still conducts academic

research.  Ms. Goggin suffers from hypertension and coronary artery disease, both of which put

her at higher risk for contracting, suffering severe complications, and potentially dying from COVID-19.  Because of her age and medical conditions, since around March 11, 2020, Ms. Goggin has been isolating herself as much as possible to prevent exposure to COVID-19.  She stays at home except to run necessary errands and always complies with social distancing guidelines when she must go out.  Ms. Goggin has also restricted visitors to her home to protect herself.  Ms. Goggin prefers to vote in-person at her local polling place, but because of her increased risk related to COVID-19, she must vote by absentee ballot during the COVID-19 pandemic, including for the November election.  Ms. Goggin understands that because of her age, she qualifies to vote by absentee ballot in Mississippi.  But Ms. Goggin also understands that, in Mississippi, her absentee ballot application and ballot envelope must be notarized or signed by a specific official to be counted because absentee voters age 65 and older are still subject to the Notarization Requirement. To comply with these requirements, Ms. Goggin would have to leave her home—where she has been self-isolating—*twice* and engage with the public at a location that provides notary services or signatures for absentee ballot materials, such as a post office or a bank.  If these requirements for absentee ballot applications and ballots are not waived during the COVID-19 pandemic, Ms. Goggin will be forced to choose between exercising her fundamental right to vote and protecting her health and life.  Even if Ms. Goggin can overcome the challenges of the Notarization Requirement, her ballot is still subject to Mississippi's signature verification law and she would not have any notice or opportunity to cure signature-related deficiencies before her ballot is rejected.

25.     Plaintiff LEAGUE OF WOMEN VOTERS OF MISSISSIPPI ("LWVMS") is the Mississippi affiliate of the national League of Women Voters (the "LWVUS").  LWVMS is a nonprofit 501(c)(4) membership organization, which relies on non-deductible dues to fund its

action and advocacy efforts.  The LWVMS also works with and through the LWVUS's Voters Education Fund, which is a 501(c)(3) organization, for which donations are tax-deductible. LWVUS's Voters Education Fund conducts voter service and education activities.  The LWVMS is a nonpartisan civic organization that neither supports nor opposes any political party or candidate.  The mission of LWVMS is to improve governance in Mississippi by engaging all Mississippians in the decisions that impact their lives.  LWVMS seeks to bring citizens into the civic process through community outreach and capacity building, voter registration and education, and community-oriented policy advocacy.

26.    The League is a grassroots organization, and most of the League's work is made possible by members and volunteers.  LWVMS has five local Leagues: East-Central Mississippi (serving Meridian and Lauderdale County), Jackson-Area (serving Hinds, Madison, and Rankin Counties), Mississippi Gulf Coast (serving Hancock, Harrison, and Jackson Counties), Oxford-North Mississippi (serving Marshall, Union, Pontotoc, Calhoun, Yalobusha, Panola, Tate, Benton, Lee, and Desoto Counties), and Pine Belt (serving Hattiesburg and the surrounding area, Forrest and Lamar Counties).  LWVMS has approximately 200 members, living in various communities across the state.  The LWVMS is diverse, inclusive, and equitable.  The majority of LWVMS members are 55 years of age or older.  The largest local League is the Oxford-North Mississippi League with 75 members; 54 of its 75 members are over 60 years old, and the oldest Oxford-North League member is 102 years old.

27.    Additionally, many LWVMS members are registered voters age 55-64 who are high risk for contracting, suffering severe complications, and potentially dying from COVID-19. Voting in person would therefore put the health of these voters at significant risk because of the

person-to-person contact at their polling place.  However, these members do not currently qualify for an absentee ballot under Mississippi law.

28.     LWVMS regularly conducts voter service projects, including voter registration drives and other events.  Local leagues lead much of the LWVMS's voter services work and local league members are essential to accomplishing voter services project goals.  Despite the person-to-person contact limitations posed by COVID-19, LWVMS continues to work to register and educate voters.  LWVMS is promoting VOTE411, a national initiative of the LWVUS's Voter Education Fund.  VOTE411 ensures all voters have the information they need to successfully participate in every election (local, state, and federal) because the League believes every election is important to guarantee that laws and policies reflect the values of the community.  VOTE411 offers a Ballot Lookup Tool for voters to enter their addresses to find their local polling place and create a personalized voter guide to take with them on Election Day for in-person voting.  LWVMS promotes VOTE411 in Mississippi by providing digital resources on voter registration, voter ID, polling locations, and absentee voting.  LWVMS also compiles voter guides for local races and offers this information to Mississippians by sending questionnaires to candidates, making telephone calls, and conducting research through electronic platforms.

29.     LWVMS has historically encouraged in-person voting on Election Day because absentee ballot rules in Mississippi are complicated and burdensome.  LWVMS believes that absentee ballot utilization is low in Mississippi because of these onerous requirements, including the requirement that voters have an excuse to vote by absentee ballot and the requirement to have both the absentee ballot application and the absentee ballot notarized or signed by a qualified witness.

30.     During the COVID-19 pandemic, however, LWVMS believes in-person voting is not an option for many, if not most, voters.  Because Defendants have failed to ensure safe voting options during the COVID-19 pandemic and because many LWVMS members are at serious risk of severe complications or even death if they were to contract COVID-19, LWVMS has been and will continue to help their members and Mississippi voters navigate the burdensome process for absentee voting.  LWVMS is working to help Mississippi voters, including their members, vote safely during the COVID-19 pandemic, including during the November general election.

31.      For example, LWVMS is seeking and has sought guidance on the implementation of HB 1521, which defines absentee ballot eligibility.  Because Defendant Watson has not issued clear guidance to the public, LWVMS has had to expend its resources to ascertain how the new law will be implemented across the state and to educate voters about these new rules.  LWVMS Gulf Coast recently contacted ten Circuit Court Clerks to discuss the implementation of HB 1521.  Of the ten Circuit Court Clerks called, only five answered the telephone.  Four of the Circuit Court Clerks that the LWVMS spoke to were unaware of the passage of HB 1521 and had not received any guidance from Defendant Watson on its implementation.

32.     The LWVMS, led by the Oxford-North local league, will also create a detailed voter guide to educate Mississippi voters on how to protect their health while voting during the COVID-19 pandemic.  The guide will explain how to navigate the absentee voting process, including the excuse and notarization requirements.  All five local leagues working with their local election officials to construct this pamphlet will be redirecting financial and other resources from their usual charitable purposes to support this initiative because of the Defendant Watson's failure to offer clear guidance on implementation of the new law.

33.    The LWVMS plans to continue this new voter education work as long as Defendants fail to ensure safe voting for Mississippi voters during the COVID-19 pandemic.  The absentee voting process in Mississippi is lengthy, complicated, and unfamiliar to most Mississippi voters.  Defendants have not done enough to help voters determine whether they qualify to vote absentee or to help voters navigate the absentee voting process safely during the COVID-19 pandemic.  Defendants have failed to waive onerous requirements, issue adequate guidance to county election officials regarding absentee ballot eligibility and other requirements, conduct any significant voter education campaigns to assist voters in navigating the absentee ballot process, or educate voters on how to vote safely during the COVID-19 pandemic.

34.    Additionally, many veteran poll workers are senior citizens who will be unable to staff in-person polling places for the November election without severe risk to their health and life. To help address this poll worker shortage, LWVMS is launching a program to recruit new poll workers from demographic groups at comparatively lower risk of serious illness from the COVID-19 pandemic.  This program was conceived to address the Defendants' failure to adequately recruit, train, and support poll workers and his failure to ensure that voters who want to vote absentee can do so to reduce stress on polling places and poll workers.  Without sufficient poll workers, LWVMS understands that election officials may close polling sites.  The LWVMS believes polling place closures will lead to dangerous over-crowding and long lines at the polls in November and beyond.  LWVMS Gulf Coast has already begun a pilot program to recruit new poll workers through peer-to-peer outreach and education.  As this program develops, the Gulf Coast league will train other local leagues on how to implement similar programs in their regions.  The LWVMS will need to divert resources from their usual voter registration work and other efforts to dedicate member time, volunteer time, and other resources to this project.

35.     Plaintiff MISSISSIPPI STATE CONFERENCE OF THE NAACP ("MS NAACP") is a non-partisan, interracial, nonprofit membership organization headquartered in Jackson, Mississippi.  The mission of the MS NAACP is to eliminate racial discrimination through democratic processes, protect the rights of voters, and ensure the equal political, educational, social, and economic rights of all persons, especially African Americans.  The MS NAACP currently consists of 112 units, which include branches, college chapters, and youth councils with a revolving membership of over 11,000 members across the state and at least one member in 74 of the 82 counties in Mississippi.

36.     The MS NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach.  A considerable amount of the MS NAACP's work and resources are devoted to promoting voter registration, voter education, get-out-the-vote efforts, election protection, and Census participation.  The MS NAACP, along with its branches, regularly conducts voter registration drives and other activities to help Mississippians vote absentee or in person throughout Mississippi.

37.     During the COVID-19 pandemic, however, the MS NAACP believes in-person voting is not an option for many, if not most, voters.  Because Defendants have failed to ensure safe voting options during the COVID-19 pandemic, and because many MS NAACP members are at serious risk of severe complications or even death if they were to contract COVID-19, the MS NAACP has been and will continue to help their members and Mississippi voters navigate the burdensome process for absentee voting.  The MS NAACP is working to help Mississippi voters, including their members, vote safely during the COVID-19 pandemic, including during the November general election.

38.     As a result of Mississippi's failure to relieve its burdensome absentee voting procedures in the midst of the COVID-19 pandemic, the MS NAACP and its branches have been forced to divert resources, including staff and volunteer time and money, to educate voters about Mississippi's absentee ballot law and process by helping them (1) understand the meaning of the Excuse Requirement and its effect on voters' ability to vote absentee; (2) understand how to comply with the Notarization Requirement while protecting their own health during the COVID-19 pandemic so that their absentee ballot may be counted; and (3) decide whether and how to vote in person during the COVID-19 pandemic if they do not qualify for an absentee ballot.  MS NAACP Members and the public often turn to the MS NAACP's branches and leadership to provide voter information given that voter education is part of the mission of the organization.

39.     To do so, the MS NAACP has spent considerable time and staff resources to educate its own leadership, branch leaders, members, and the general public about Mississippi's absentee voting laws and how to comply during the COVID-19 pandemic.  Its branch leaders are also educating themselves about the Excuse Requirement to answer local members' questions about absentee voting during the COVID-19 pandemic.

40.     Voter registration and education campaigns are the hallmark of MS NAACP's programmatic work.  MS NAACP has not been able to devote nearly as much time as it typically does on its statewide voter campaigns because it has had to shift its traditional voter education work to focusing largely on absentee voting under the Excuse Requirement.  Due to the COVID-19 pandemic, the MS NAACP has spent additional staff time and resources toward informing its members about how to vote during the pandemic—including casting an absentee ballot under the Excuse Requirement—which has taken away staff and volunteer time from its COVID-19 programming.  This programming provides support to its members and the public facing the

socioeconomic impact of the COVID-19 pandemic with information related to healthcare, housing, education, and other aspects of daily life outside of voting affected by the pandemic. The COVID-19 absentee voting education is of particular importance to MS NAACP as absentee ballot applications become available soon.

41.    MS NAACP also coordinates with partner advocacy organizations to run the statewide voter protection hotline, which typically becomes more active leading up to an election once absentee ballot applications become available. Based on the amount of questions MS NAACP currently receives from community members and its own members about the Excuse Requirement and the current confusion, it anticipates a significant increase in questions on how to cast an absentee ballot during the COVID-19 pandemic. MS NAACP and its partners are devoting staff time to build out the hotline infrastructure, recruiting more volunteers for the hotline and taking additional necessary steps to prepare for the increased volume in absentee voting calls.

42.    Since the enactment of HB 1521, MS NAACP has held two virtual community education conversations for the public and two virtual branch meetings discussing absentee voting procedures, the Excuse Requirement, and HB 1521. The most recent public education program was on August 21, 2020. While some MS NAACP members have voted by absentee ballot in past elections and most likely will vote by absentee ballot in future elections, many of them will be voting absentee for the first time because of the COVID-19 pandemic. Additionally, many MS NAACP members are registered voters age 55-64 who are high risk for contracting, suffering severe complications, and potentially dying from COVID-19. Voting in person would therefore put the health of these voters at significant risk because of the person-to-person contact at their polling place. But these members do not currently qualify for an absentee ballot under Mississippi law. Members and the public at large have turned to MS NAACP and its branch leaders with

17

questions on the Excuse Requirement because voter education is at the forefront of its work.  MS NAACP is developing fact sheets and materials to more clearly explain the Excuse Requirement, as many of its members are uncertain as to whether they can vote absentee during the pandemic under this excuse.

43.     MS NAACP plans to continue its COVID-19 absentee voter education work as long as Defendants fail to ensure safe voting for Mississippi voters during the pandemic.  The absentee voting process in Mississippi is lengthy, complicated, and unfamiliar to most Mississippi voters. Defendants have not done enough to help voters determine whether they qualify to vote absentee or to help voters navigate the absentee voting process safely during the COVID-19 pandemic. Defendant Watson has failed to waive onerous requirements, issue adequate guidance to county election officials regarding absentee ballot eligibility and other requirements, conduct any significant voter education campaigns to assist voters in navigating the absentee ballot process, or educate voters on how to vote safely during the COVID-19 pandemic.

## **DEFENDANTS**

44.     Defendant MICHAEL WATSON is the Secretary of State of Mississippi and is sued in his official capacity.  As head of the Elections Division, he is responsible for assuring that Mississippians' voices are heard clearly through the election process, training elections officials, collecting election returns, and assisting local election officials in carrying out their election related responsibilities.  Mississippi Secretary of State, "Elections & Voting" (last accessed August 12, 2020), http://www.sos.ms.gov/Elections-Voting/Pages/default.aspx.  Secretary Watson is the chief election officer for the purposes of the National Voter Registration Act. Miss. Code Ann. § 23-15-211.1.  Secretary Watson is also responsible for implementing voting system standards under the Help America Vote Act and issuing supplementary instructions for the safe and efficient use of electronic voting systems.  *Id*. §§ 23-15-169.5, 23-15-525.   Under Section 25-33-33 of the

Mississippi Code, the Secretary of State may prescribe forms and establish fees for services not otherwise provided by law.  In addition, under section 25-33-1 of the Mississippi Code, the Secretary of State is responsible for issuing notary public commissions on behalf of the Governor to all qualified applicants.  The Secretary of State has authority to promulgate regulations under the Mississippi Administrative Procedures Act.  *Id.* § 25-43-1.101, *et. seq*.  The Secretary of State's Office also reviews the Mississippi Election Code to consider changes and updates to present to the State Legislature for consideration.  Mississippi Secretary of State, "Election Code," (last accessed August 12, 2020), https://www.sos.ms.gov/Policy-Research/Pages/Election-Code.aspx. The Governor of Mississippi can delegate their limited emergency powers to the Secretary of State for the specific purpose of safeguarding Mississippi voters and elections.  Miss. Code Ann. § 33-15-11, *et seq*.  Once the Governor delegates this power, the Mississippi Secretary of State has the power to expand absentee voting to safeguard Mississippi voters and elections.  *See* Miss. Code Ann. § 23-15-713(d).

45.     Defendant LYNN FITCH is the Attorney General of the State of Mississippi and is sued in her official capacity.  In that capacity, she serves as the chief legal officer and advisor for the state and is charged with managing all litigation on behalf of the state, except as otherwise specifically provided by law.   As Attorney General, Defendant Fitch is responsible for "interven[ing] [and arguing] the constitutionality of any statute when notified of a challenge thereto."  Miss. Code Ann. § 7-5-1.  The Attorney General also gives written opinion to the Secretary of State and other state and local officials on "any question of law relating to their respective offices."  Miss. Code Ann. § 7-5-25.  Defendant Watson has requested an Attorney General opinion from Defendant Fitch regarding circuit clerks' discretion to allow voters to request an absentee ballot under the Excuse Requirement for fear of contracting the coronavirus.

## FACTUAL ALLEGATIONS

**I.    The COVID-19 Pandemic Poses a Serious Threat to Public Health and Safety in Mississippi.**

**A.    Public Health Impact of COVID-19**

46.    The novel coronavirus, SARS-CoV-2, is highly contagious and spreads through a variety of means, including respiratory droplets and contact between individuals.  Once contracted, it can have a range of effects on the diagnosed individual, from recovery without any symptoms at all, to flu-like symptoms, to a severe immune system response that can cause fluid to build in the person's lungs and lead to death.  The disease poses a severe risk to all individuals, particularly those who are either elderly, or, regardless of age, are immunocompromised, or have other underlying conditions like chronic lung disease, diabetes, obesity, or moderate to severe asthma.

47.    Because of the highly contagious and potentially deadly nature of the disease, on March 13, 2020, President Trump declared a national state of emergency given the widespread outbreak of COVID-19.  Within a week, at least 48 states—including Mississippi—had declared local states of emergency.

48.    Since then, the coronavirus has continued to spread throughout the United States, resulting in a higher number of COVID-19 cases than any other country. At the time of filing of this Complaint, the confirmed number of infections in the United States has surpassed 5.7 million, and over 173,000 people have lost their lives nationwide. *See* Johns Hopkins University & Medicine, *Coronavirus Resource Center*, https://coronavirus.jhu.edu/data/new-cases (last updated August 26, 2020).  The number of confirmed cases and deaths is likely to be significantly lower than the actual total.

49.    COVID-19 spreads aggressively, in part because asymptomatic and pre-symptomatic individuals can infect others with whom they come into contact without being aware

they themselves are infected.  *See* Furukawa, Brooks & Sobel, *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, Emerg. Infect. Dis. Vol. 26, No. 7 (May 4, 2020).  Evidence from recent studies indicates that between 30% and 40% of infected individuals never develop symptoms but can carry as much of the virus and be as contagious as those who do show symptoms—and may remain contagious for up to seventeen days after infection.  *See* Apoorva Mandavilli, *Even Asymptomatic People Carry the Coronavirus in High Amounts*, N.Y. Times, Aug. 6, 2020.

50.     There is currently no vaccine for COVID-19, and there will not be a widely available vaccine before the November 2020 election.  According to Food and Drug Administration (FDA) vaccine board member Dr. Paul Offit, this unprecedented public health crisis is likely to continue until an effective vaccine is widely available, which is highly unlikely until 2021.  *See* Stacey Vanek Smith, *FDA Adviser: Not Realistic To Expect A COVID-19 Vaccine in 2020*, NPR, Aug. 5, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/08/05/899411652/fda-adviser-not-realistic-to-expect-a-covid-19-vaccine-in-2020.

51.     There is also no cure for the virus that causes COVID-19, though treatments are under investigation and being used to respond to the crisis on an emergency basis.

52.     Therefore, public health authorities at the federal and state level have made it clear that there is one tool available to avoid infection on an individual level and slow the spread of COVID-19 across a population: social distancing.  "Social distancing" involves avoiding crowds and large groups, ensuring at least 6 feet of distance when interacting with people outside one's household, and wearing a mask.  "Social distancing" measures and other guidance provided by federal, state, and local governments have been crucial to slowing the spread and preventing even wider infection and death.  Because of the inability to contain the spread of the coronavirus, public

21

health experts predict the US death toll will double between now and the end of 2020, in part due to an increased rate of transmission during the fall.  Nurith Aizenman, *300,000 Deaths By December? 9 Takeaways From The Newest COVID-19 Projections*, NPR, August 6, 2020, https://www.npr.org/sections/health-shots/2020/08/06/900000671/300-000-deaths-by-december-9-takeaways-of-the-newest-covid-19-projections.

53.     Although COVID-19 has impacted Americans of all ages and backgrounds, public health experts have warned that it can be particularly dangerous for certain demographic groups, including older persons, individuals with underlying medical conditions, and people of color.

54.     Even as coronavirus outbreaks have worsened in Mississippi and other states over the summer, public health experts have warned that cases of COVID-19 may increase significantly in the fall and winter.

### B.     COVID-19 in Mississippi

55.     Mississippi has seen a surge in infections in recent months.  Mississippi is currently confirming over 1,000 new coronavirus cases and 50 deaths each day.  *See* Mississippi State Department of Health, *COVID-19 in Mississippi*, https://msdh.ms.gov/msdhsite/_static/14,0,420.html#Mississippi (last updated August 23, 2020). To date, the coronavirus has infected more than 79,000 Mississippians and resulted in over 2,300 deaths in the state.  *Id*.

56.     On April 2, 2020, Governor Reeves rescheduled Mississippi's special election for House District 88 from April 21, 2020 to June 23, 2020 to help "to slow the spread of COVID-19."  Press Release: Governor Tate Reeves Reschedules Special Election (Apr. 2, 2020), https://www.sos.ms.gov/Pages/Governor-Tate-Reeves-Reschedules-Special-Election-for-House-Disrict-88.aspx.  In making this announcement, Governor Reeves stated: "The health and well-

being of all Mississippians must and always will be our top priority.  We are closer to the beginning

than the end of this outbreak and conducting an election at this time would unnecessarily put our

poll workers and voters at risk.  We must protect our rights as Americans to a free and fair election,

but not at the expense of the health and safety of our people.  Stay home, stay healthy." *Id*.

57.    On April 3, 2020, Governor Reeves issued a state-wide "Shelter in Place" stay-at-

home order in response to the crisis and urged residents to maintain social distancing to combat

the coronavirus's spread.  State of Mississippi, Office of the Governor, Executive Order Nos. 1466,

1473.  On April 6, 2020, the Mississippi Department of Public Health adopted guidance from the

Centers for Disease Control and Prevention ("CDC") recommending that people wear cloth masks

and observe social distancing practices in public to slow the spread of the coronavirus. Mississippi

State    Department    of    Health,    News    Release    (Apr.    6,    2020),

https://msdh.ms.gov/msdhsite.index.cfm/23,21953,341,html.  On  April  14,  2020,  Governor

Reeves directed all Mississippi schools to remain closed through the end of the 2019-2020 school

year.  Press Release: Governor Tate Reeves Announces Signs Executive Order Closing Schools

for Academic Year (Apr. 23, 2020), https://www.sos.ms.gov/Pages/Governor-Tate-Reeves-Signs-

Executve-Order-Closing-Schools-for-Academic-Year.aspx.

58.    On April 24, 2020, Governor Reeves signed a Safer At Home Order, encouraging

residents to stay home as much as possible, while carefully opening certain Mississippi businesses.

State of Mississippi, Office of the Governor, Executive Order Nos. 1477, 1478, 1480, 1484, 1486,

1487, 1488.  The State of Mississippi then underwent a gradual multi-phase reopening, and on

May 28, 2020, the Safer At Home Order was replaced with a Safe Return Order, under which all

Mississippi businesses could reopen, but which advised residents at heightened risk of infection

and death to continue sheltering in place to protect their health.  This includes all elderly

individuals (age 65 or older) and individuals "with serious underlying health conditions, including high blood pressure, chronic lung disease, diabetes, obesity, asthma, and those whose immune systems are compromised as such by chemotherapy for cancer or any other condition requiring such therapy."   State of Mississippi, Office of the Governor, Executive Order No. 1492, https://www.sos.ms.gov/Education-Publications/Pages/Executive-Orders.aspx.

59.     Although Governor Reeves provided guidance permitting Mississippi businesses to begin reopening on April 24, 2020, government offices—including the Office of the Secretary of State—remained closed to the public for safety reasons.   The Secretary of State's office remained closed until June 15, 2020 "[i]n an effort to help prevent the spread of COVID-19." Press Release: Secretary of State's Office Buildings Temporarily Closed To The Public (March 17, 2020), https://www.sos.ms.gov/About/Pages/Press-Release.aspx?pr=1101.   Since reopening, the Secretary of State's Office "strongly encourage[s] visitors to make every effort to conduct SOS business online or over the phone" to limit the number of people in the office.   Press Release: Secretary of State's Office Set to Reopen to the Public Monday (June 11, 2020), https://www.sos.ms.gov/About/Pages/Press-Release.aspx?pr=1107.

60.     Despite these efforts, the number of cases of COVID-19 in Mississippi continues to rise substantially.   Since issuing the Safe Return Order on April 24, 2020, Governor Reeves has amended and extended the Order eight times (June 10, June 28, July 2, July 19, July 24, July 30, and August 14).   Executive Order 1518, currently in effect until Monday, August 31 at 8:00am, extends the face covering requirement established in Executive Order 1516 for Mississippians "inside a business, school or other building or space open to the public, or when in an outdoor public space whenever it is not possible to maintain a minimum of six feet of social distancing from another person not in the same household."   State of Mississippi, Office of the Governor,

24

Executive Order Nos. 1516, 1518.  Executive Order 1518 notes that the "key to reducing the community transmission of COVID-19" and keeping Mississippi schools open is to "consistently wear a face covering while in public spaces, to practice social distancing from persons not in the same household and to maintain good hand hygiene."  State of Mississippi, Office of the Governor, Executive                                  Order                                  No.                                  1518, https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1518.pdf.

61.     Infections in Mississippi have exploded through August, with the state on pace to exceed the number of deaths reported in July, the deadliest month since COVID-19 rapidly increased nationwide in March.  Through Thursday, August 13, the Mississippi Department of Health reported 530 deaths this month alone from COVID-19.  Magnolia State Live, Bump in Curve: Mississippi's New Coronavirus Averages Creep Back Up (August 20, 2020), https://www.magnoliastatelive.com/2020/08/20/bump-in-curve-mississippis-new-coronavirus-averages-creep-back-up/.  Researchers from Johns Hopkins University indicate that Mississippi's most recent seven-day moving positive rate was around 20%.  Jimmie E. Gates, Clarion Ledger, *MUW, Ole Miss Report 'Considerable' Student Cases of COVID-19 as In-Person Classes Resume* (August 19, 2020), https://www.clarionledger.com/story/news/2020/08/19/covid-19-outbreaks-at-two-mississippi-universities/5606048002/.  The current rate of spread and the lack of imposition of more restrictive control measures suggest it is highly unlikely the situation will improve significantly prior to November 2020, and is likely to actually worsen through the fall as schools continue to reopen and COVID-19 overlaps with the typical flu season.  *See id*.; Chet Landry, *Harvard Professor: "I am concerned about the state of the outbreak in Mississippi"*, WLOX, Aug. 2, 2020, https://www.wlox.com/2020/08/02/harvard-professor-i-am-concerned-about-state-outbreak-mississippi/.

II.     **Mississippi's Absentee Voting Procedures Significantly Burden the Fundamental Right to Vote and Deny Voters' Due Process Rights.**

A.     **Mississippi's Absentee Ballot Requirements**

62.     Mississippi is an excuse-required absentee voting state.  Mississippi law only allows specific categories of voters with qualifying excuses to vote by absentee ballot.  Unless Mississippi voters satisfy one of the enumerated excuses, they must either vote in person in the upcoming elections, or not vote at all.

63.     The excuses permitted by law include: (1) the voter's studies or employment at a school necessitates their absence from the county on Election Day; (2) the voter is an employee of a member of the Mississippi congressional delegation or a spouse or dependent of the employee residing with the absentee voter away from their county of residence; (3) the voter is outside of the county of residence on Election Day for any reason; (4) the voter has a temporary or permanent physical disability and who, because of such disability, is unable to vote in person without substantial hardship to himself or others, or whose attendance at the voting place could reasonably cause danger to himself or others; (5) the voter is the parent, spouse, or dependent of a person with a temporary or permanent physical disability who is hospitalized outside the county of residence or more than fifty (50) miles away from his residence and the voter will be with such person on Election Day; (6) the voter is sixty-five (65) years of age or older; (7) the voter is a member of the Mississippi congressional delegation absent from Mississippi on Election Day, or the spouse or dependents of the member of the congressional delegation; or (8) the voter is required to be at work on Election Day during the times at which the polls will be open.  Miss. Code Ann. § 23-15-713.

64.     Governor Reeves recently signed into law amendments to Mississippi's Excuse Requirement under HB 1521, which explicitly defined an existing excuse to include voters under

"a physician-imposed quarantine due to COVID-19 during the year 2020" or "caring for a dependent who is under physician-imposed quarantine due to COVID-19" within the existing temporary or permanent physical disability excuse.  The terms "physician-imposed quarantine", "caring for", and "dependent" are not defined.

65.     To vote by absentee ballot, a voter may make a request for an absentee application orally, in writing, or by calling the circuit clerk's office.  Miss. Code Ann. §§ 23-15-627, 23-15-657.

66.     The absentee ballot application includes a warning in boldface that making a "false statement" on an absentee ballot application and selling one's vote is punishable with a fine of up to $5,000 and a state prison sentence of up to five years.  Miss. Code Ann. § 23-15-627.

67.     The application requires all applicants, except those who are "temporarily or permanently disabled" to have their application "notarized or signed by an official authorized to administer oaths for absentee balloting."  Miss. Code Ann. § 23-15-627.  Both notarization and officials' attestation are typically conducted in-person, requiring close contact between the individual receiving the notarization and the Notary.

68.     Once a request is made for an absentee ballot application, the county clerk can mail the application to the voter if the voter cannot appear at the clerk's office to complete the application in person.  Miss. Code Ann. § 23-15-715(a)-(b).

69.     After receiving a properly completed and notarized absentee ballot application, "the registrar shall send to such absent voter a proper absentee voter ballot within twenty-four (24) hours" of having received a notarized application, or "as soon thereafter as the ballots are available."  Miss. Code Ann. § 23-15-715(a).  The voter must then find a "postmaster," "postal

supervisor," or "other officer having authority to administer an oath" to act as a witness and watch them complete the ballot envelope.  Miss. Code Ann. § 23-15-631.

70.     Eligible absentee voters under the temporary or permanent physical disability must have a witness eighteen (18) years of age or older sign both their absentee ballot application and ballot envelope.  Miss. Code Ann. §§ 23-15-627, 23-15-631(1).

**B.     Voting in Person Imposes a Significant Burden on Mississippi Voters During the COVID-19 Pandemic.**

71.     Historically, most voters in Mississippi must vote in person on Election Day because the ability to vote by absentee ballot is limited to the narrow excuses in the statute.  For most voters, this means physically appearing at a designated polling place where they must not only be in close contact with other voters, observers, and poll workers, but must also repeatedly touch equipment and materials such as voting machines, paper ballots, and shared writing instruments.  At present, public health officials consider all these activities as risking exposure to the transmission of COVID-19.  Ctrs. for Disease Control and Prevention, *Considerations for Election Polling Locations* (June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.  The ongoing health risks posed by COVID-19 necessitate expanded absentee ballot access that would prevent thousands of individuals from lining up with other voters at polling places (sometimes for hours), touching the same equipment, having face-to-face interactions with poll workers, and threatening their own health and the health of others.

72.     Meaningful opportunities to vote in person are still necessary for many Mississippi voters, including those who lack access to reliable mail service or need the kinds of accommodations that are only available at in-person sites, such as persons with disabilities and people with limited literacy.

73.   To reduce the risk that individuals who need to vote in person will be exposed to COVID-19, the CDC's *Considerations for Election Polling Locations* report provides specific guidelines for voting during the COVID-19 pandemic, which recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations," including "mail-in methods of voting" like absentee voting.  Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations* (updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.   These are essential recommendations, especially because the risks of voting absentee are minimal.

74.   Most states have already entirely eliminated any excuse requirement to vote absentee, even when their voters are not threatened by a public health crisis.[1]  Kate Rabinowitz and Brittany Renee Mayes, Washington Post, *At Least 76% of American Voters Can Cast Ballots by Mail in the Fall* (August 13, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/.   Other states, that in normal circumstances maintain similarly limited eligibility requirements for voting absentee, have recognized that the extraordinary circumstances caused by the COVID-19 pandemic require loosening such requirements.  Alabama, Arkansas, Delaware, Massachusetts, New Hampshire, and West Virginia have all agreed to permit any voter to use COVID-19 as a valid excuse for requesting to vote absentee at least through the November general election.[2]

---

[1] National Conference of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options* (July 10, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (34 states and Washington, D.C., offer "no-excuse" absentee/mailed ballot voting).

[2] *See* Ala. Sec'y of State, *Absentee Voting During State of Emergency* (July 17, 2020), https://www.sos.alabama.gov/sites/default/files/proposedRules/820-2-3-.06-.04ER.pdf; Ark. Executive Dep't., *Executive Order 20-44* (Aug. 7, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf;  Del. Office of the Governor, *Sixth Modification to State of Emergency* (Mar. 24, 2020),

75.     Over the past three months, COVID-19 has spread throughout Mississippi at a rapid pace—a trend experts say is unlikely to reverse—and may worsen—before the November election. Because as many as 40% of infected individuals never show symptoms—and yet can be just as contagious, for up to two weeks after infection, *see infra* ¶ 44 —it is reasonable to fear that infected voters and poll workers will be present at in-person voting sites on November 3, creating an infection risk for others.

76.     Because of these continued risks, many Mississippians—like Plaintiffs and the Organizational Plaintiffs' members—who would otherwise vote in person on Election Day will reasonably opt and/or be required to stay home and continue practicing social distancing for the foreseeable future, even after the peak of the current outbreak of COVID-19 in Mississippi.  They will want to vote by mail.

77.     Evidence of the health risks associated with in-person voting is unfortunately accumulating during this election season.  Multiple Florida poll workers tested positive for COVID-19 in the aftermath of the in-person primary election on March 17, 2020 long before COVID-19 was widespread in Florida and nationwide, leaving election officials to contact voters who had voted at those locations and warn them they were at risk.  Kent Justice & Steve Patrick, *Duval County Poll Worker Tests Positive for Coronavirus*, News 4 Jax, Mar. 30, 2020, https://www.news4jax.com/news/local/2020/03/30/duval-county-poll-worker-tests-positive-for-

---

https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf.; Mass. Sec'y of State, COVID-19 Elections Updates (July 6, 2020), https://www.sec.state.ma.us/ele/covid-19/covid-19.htm; N.H. Sec'y of State, *Memorandum Re Elections Operations During the State of Emergency* (Apr. 10, 2020), https://www.nhpr.org/sites/nhpr/files/202004/covid-19_elections_guidance.pdf.; W. Va. Sec'y of State, *Secretary of State Mac Warner Announces Voting Options for Voters to Continue Making Safe Decisions in 2020 General Election* (July 27, 2020), https://sos.wv.gov/news/Pages/07-27-2020-A.aspx.

coronavirus/.  Chicago election officials reported that a poll worker for the city's March 17, 2020 election died of COVID-19, prompting officials to send letters notifying voters, poll workers, field investigators, and cartage companies who were present at the same polling site.  Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, 5 Chicago, Apr. 13, 2020, https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.  Wisconsin officials reported 71 voters contracted COVID-19 after voting in person in their April 7, 2020 election.  Poll workers have tested positive after elections in other states including Alabama, Texas, and Pennsylvania.[3]

78.    CDC guidance on safe voting practices advises that "[t]he more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread" and "elections with only in-person voting on a single day are higher risk for COVID-19 spread because there will be larger crowds and longer wait times."  Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).  Accordingly, the CDC recommends "lower risk" election polling settings, including "a wide variety of voting options"; "longer voting periods (more days and/or more hours)"; and "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."  *Id.*

---

[3] *See* Eddie Burkhalter, *Piedmont Poll Worker in Tuesday's Runoff Tests Positive for COVID-19, Hospitalized*, Alabama Political Reporter (July 20, 2020); Tommy Witherspoon, *Election Workers Come Down With COVID-19 as Numbers Continue to Rise*, Waco Tribune-Herald (July 20, 2020); Katie Meyer & Emily Previti, *A Philly Poll Watcher Got COVID-19, But The City Isn't Notifying Voters*, WHYY (June 24, 2020).

### 1.      Voters with Underlying Medical Conditions & Their Loved Ones

79.     The CDC has warned that "people of any age who have certain underlying medical conditions are at increased risk for severe illness from COVID-19" and has identified certain conditions that are likely to exacerbate the impact of COVID-19, including asthma, chronic lung disease, diabetes, serious heart conditions, chronic kidney disease being treated with dialysis, severe obesity, liver disease, immune deficiencies, and a myriad of other conditions that compromise an individual's immune system.  Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions* (last updated July 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Plaintiffs Goggin and Parham, and some Organizational Plaintiffs' members suffer from one or more of these underlying medical conditions that increase their risk of serious illness and death from COVID-19.  Plaintiff Oppenheim lives with his wife and regularly interacts with his mother-in-law, both of whom are high-risk for severe complications and potentially death if they contract coronavirus.

80.     Because of these increased risks to their health and safety, Mississippi voters with any of these conditions—and their loved ones—would face especially significant burdens if forced to choose between potential exposure to COVID-19 and their fundamental right to vote.

### 2.      Black Voters

81.     Defendants' application of the current Excuse Requirement and Notarization Requirement during the COVID-19 pandemic also places a significant burden on Black voters, who face heightened risks from exposure to COVID-19 because of well-documented disparities in health and health care that put them at higher risk for COVID-19 at every step of the process.

82.     *First*, Black voters face a greater risk of contracting coronavirus on their way to the polls due to increased reliance on public transportation.  Black Americans are less likely to own cars than any other demographic of Americans, and they "represent about one-quarter of all public transit users."   Rashawn Ray, *Why Are Blacks Dying at Higher Rates from COVID-19?*, Brookings,  Apr.  9,  2020,  https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19.   Black voters without access to private transportation face additional risks of contact with exposed individuals in close quarters on public transportation en route to their polling places.

83.     *Second*, Black voters are disproportionately burdened by long lines at the polls. Maintaining the Excuse Requirement may result in closed polling places because of poll worker shortages which will result in longer lines with an inability to practice adequate social distancing. For Black voters, these problems are exacerbated by existing racial disparities in wait times: a recent study based on data from millions of smartphone users during the 2016 presidential election found that residents of entirely-Black neighborhoods waited 29% longer to vote and were 74% more likely to spend more than 30 minutes at their polling place than residents of all-white neighborhoods.[4]  And Black voters can least afford unnecessarily long wait times as the price to pay for voting because Black people are "more likely to be working in jobs without flexibility or paid sick leave," which means any delays at the polls disproportionately threaten their job security.[5]

---

[4] M. Keith Chen, et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* (Nov. 14, 2019),
https://www.kareemhaggag.com/f/Racial_Disparities_in_Voting_Wait_Times.pdf.
[5] Demos, *How to Build a Racially Inclusive Democracy During COVID-19 and Beyond* (Apr. 28, 2020), https://www.demos.org/policy-briefs/how-build-racially-inclusive-democracy-during-covid-19-and-beyond.

84.     *Third*, if Black voters contract coronavirus while voting in person or while obtaining a notary or authorized official's attestation, they are more likely to suffer serious and even deadly consequences because they disproportionately suffer from the underlying medical conditions that exacerbate COVID-19.  Decades of research, statements from public health experts, and data from the U.S. Department of Health and Human Services all reflect that Black Americans have disproportionately high rates of asthma, diabetes, high blood pressure, and obesity.  The CDC and other reports have cited racial disparities in these underlying medical conditions as a factor that influences the disproportionate impact of COVID-19 on the Black community.

85.     *Fourth*, if Black voters contract coronavirus while voting in person or obtaining notarization or attestation for absentee voting, they are also more likely to suffer serious consequences because of inequalities in our health care system.  Studies conducted by the American Journal of Public Health, The Agency for Healthcare Research and Quality, and other organizations over the past few decades indicate that Black people are less likely to have insurance and access to affordable medical testing.  *See also* Karen Bascom, University of Mississippi Medical Center, *COVID-19 Impacts Black Communities More Heavily, Study Shows* (May 7, 2020),                https://www.umc.edu/news/News_Articles/2020/05/COVID-19-impacts-black-communities-more-heavily.html.  The CDC has cited "barriers to getting health care," including lack of health insurance coverage, as one factor that "might make members of many racial and ethnic minority groups especially vulnerable in public health emergencies like outbreaks of COVID-19."  Additionally, according to a U.S. News & World Report article, "African Americans are more likely than whites to rely on hospital emergency rooms for primary care – departments that soon may be overwhelmed with anticipated surges of COVID-19 patients."  Joseph P. Williams, *Rumor, Disparity and Distrust: Why Black Americans Face an Uphill Battle Against*

*COVID-19*, U.S. News and World Report, Mar. 25, 2020, https://www.usnews.com/news/healthiest-communities/articles/2020-03-25/why-black-americans-face-an-uphill-battle-against-the-coronavirus.   Some studies have shown that, even when Black people can obtain health care, it is of disparate quality compared to non-Black people.

86.     *Fifth*, if Black voters contract coronavirus while voting in person or obtaining notarization or attestation for an absentee ballot, they also face increased risks of spreading coronavirus to their loved ones and community.  *See* Karen Bascom, University of Mississippi Medical Center, *COVID-19 Impacts Black Communities More Heavily, Study Shows* (May 7, 2020), https://www.umc.edu/news/News_Articles/2020/05/COVID-19-impacts-black-communities-more-heavily.html.  As discussed above, Black voters are more likely to rely on public transportation, and Black voters are more likely to live in "subpar neighborhoods [that] are rooted in the historical legacy of redlining" and in "densely populated areas, further heightening their potential contact with other people." Rashawn Ray, *Why Are Blacks Dying at Higher Rates from COVID-19?*, Brookings, Apr. 9, 2020, https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19.

87.     These systemic failures help to explain why COVID-19 is currently ravaging Black communities in Mississippi and nationwide.  As the CDC has noted, "[h]istory shows that severe illness and death rates tend to be higher for racial and ethnic minority groups during public health emergencies," and COVID-19 data demonstrates that the same is true of the current pandemic. Demographic data reported by the CDC on the number of COVID-19 cases for which race was available nationwide (48% of the 4,028,586 cases analyzed) shows that Black people make up 19.8% of the reported COVID-19 cases although they only make up 13.4% of the total U.S.

35

population.  Although only 37.8% of the Mississippi population is Black, the Mississippi State Department of Health reports that 49.5% of Mississippians who have died from COVID-19 have been Black.  Out of the total persons infected with COVID-19 in Mississippi, 51.8% are Black. Mississippi State Department of Health, COVID-19 Deaths by Race/Ethnicity through August 23, 2020,      Mississippi      (last      updated      August      23,      2020), https://msdh.ms.gov/msdhsite/_static/14,21995,420,873.html.

88.     These risks, both individually and collectively, demonstrate that in-person voting and the requirement of obtaining a witness attestation or notary for an absentee ballot imposes an especially significant and life-threatening burden on Black voters, including Plaintiff Parham and many of MS NAACP's members.

### 3.     Older Voters

89.     Mississippi's current Excuse Requirement will disproportionately burden older voters and poll workers, who face heightened risks from contracting the coronavirus.

90.     If older voters contract the coronavirus while voting in person or while obtaining notarization or attestation for an absentee ballot, they are more likely to suffer serious and even deadly consequences. The CDC has warned that "[p]eople aged 65 years and older" are at higher risk for severe illness and death from COVID-19 because "[t]he immune systems of older adults weaken with age, making it harder to fight off infections," and "older adults commonly have chronic diseases that can increase the risk of severe illness from COVID-19."  Thus, "the older you are, the higher your risk of serious disease."

91.     Plaintiff Goggin and many members of the Organizational Plaintiffs are 65 or older and therefore have an increased risk of serious illness from COVID-19.

92.     COVID-19 is already having a devastating impact on elderly individuals in Mississippi.  More than 37% of Mississippians who have contracted COVID-19 are ages 50 and older, and that same age group represents over 93% of Mississippi's confirmed deaths.  Mississippi Department of Health, COVID-19 Cases and Deaths by Age Group through August 24, 2020, https://msdh.ms.gov/msdhsite/_static/14,0,420.html#map (last updated Aug. 24, 2020).

93.     If older voters contract the coronavirus while voting in person or while obtaining a notary or oath attestation for absentee voting, they also face increased risks of spreading the coronavirus to their loved ones and community, because they are more likely to require in-person care or assistance.  The CDC has warned that the "communal nature of nursing homes and long-term care facilities, and the population served (generally older adults often with underlying medical conditions), put those living in nursing homes at higher risk of infection and severe illness from COVID-19."  The impact of COVID-19 in Mississippi nursing homes serves as a stark example: to date, there are 173 active outbreaks in Mississippi's long-term care facilities, where one or more resident or staff member has been infected.  Mississippi State Department of Health, LTCF Cases and Deaths Among Residents by County and Race, https://msdh.ms.gov/msdhsite/_static/resources/8578.pdf (last updated Aug. 24, 2020).  Over 41% of deaths in Mississippi are residents of long-term care facilities.  See *Id.*; Mississippi State Department of Health, Mississippi COVID-19 Cases and Deaths by Race with Ethnicity, https://msdh.ms.gov/msdhsite/_static/14,21882,420,873.html (last updated Aug. 24, 2020).

94.     These same risks will also impact many older poll workers, who make up a large proportion of election officials.  A Pew Research report notes that, "[i]n the 2018 general election, around six-in-ten U.S. poll workers (58%) were ages 61 and older, including roughly a quarter (27%) who were over 70."  Michael Barthiel and Galen Stocking, Pew Research Center, *Older*

*People Account for Large Shares of Poll Workers and Voters in U.S. General Elections* (April 6,

2020), https://www.pewresearch.org/fact-tank/2020/04/06/older-people-account-for-large-shares-

of-poll-workers-and-voters-in-u-s-general-elections/.

### 4.      Voters with Disabilities

95.     Mississippi's current Excuse Requirement will disproportionately burden voters

with certain disabilities, especially those who need to vote in person during the COVID-19

pandemic.

96.     Voters with certain disabilities face a significant risk of contracting coronavirus and

exposing themselves to COVID-19 at the polls or on their way to polling locations.  According to

the CDC and Pew Trusts, "[m]any people with disabilities cannot mark paper ballots without

assistance, so they rely on special voting machines" with features like touch screens, other manual

input devices, and earphones to vote, any of which could carry the coronavirus from previous users

and poll workers.  Additionally, social distancing practices are more difficult for voters with

certain disabilities—for example, voters who are blind or have limited vision cannot see visual

markers on the ground instructing voters to line up six feet apart from each other.

97.     These difficulties are compounded by the fact that an inability to use paper ballots

without assistance forecloses many voters with disabilities from voting by mail.  Because many

voters with disabilities are unable to submit mail-in absentee ballots without assistance or

accommodations, they will continue to need to vote in person during the COVID-19 pandemic,

despite the risks posed by in-person voting.

98.     In addition to significantly burdening voters with disabilities who need to vote in

person in the general election in November 2020, Mississippi's application of the Excuse

Requirement will likely dissuade some voters with disabilities from voting altogether, such as

people whose disabilities serve as comorbidities for COVID-19, people whose disabilities make social distancing more difficult, and people whose physical disabilities make them unable to stand in long lines at the polls.

99.    The state has already determined that some voters can vote absentee and has explicitly defined an existing excuse to include some voters impacted by COVID-19, conceding that current pandemic conditions require a modification of existing restrictions on absentee by mail voting.  Mississippi law provides many safeguards that protect the integrity of the absentee ballot process—voters must sign their absentee ballot application under penalty of perjury and include either the last four digits of their social security number or full driver's license number before receiving an absentee ballot.  Once received, voters must also sign their absentee ballot envelope under penalty of perjury, which may be subject to challenge as with ballots cast in-person on election day.

**C.    State and County Officials Have Created Confusion as to the Eligibility to Vote by Mail During the COVID-19 Pandemic, Burdening Voters.**

100.   Prior to the passage of HB 1521, Defendant Watson stated that circuit clerks had discretion to allow people to vote early for fear of COVID-19 under existing law, specifically, section 23-15-713(d) of the Mississippi Code.  Bobby Harrison, *Secretary of State Says Existing Law Allows Mail-in Voting Expansion During Coronavirus Pandemic. Is that Enough?*, Mississippi Today, June 3, 2020, https://mississippitoday.org/2020/06/03/secretary-of-state-says-existing-law-allows-mail-in-voting-expansion-during-coronavirus-pandemic-is-that-enough/. Defendant Watson's position is in accord with the "temporary disability" provision of the Excuse Requirement.

101.   Despite the plain language of section 23-15-713(d), the legislature passed HB 1521 that was intended to broaden the category of people who were eligible to vote absentee.

102.    In June 28, 2020 floor testimony before the Mississippi House of Representatives in connection with the passage of HB 1521, Mississippi legislators indicated that if a voter "ha[s] symptoms [of COVID-19] but you have not been to a doctor, currently the department of Health and physicians are telling you to stay home and self-quarantine, that would count," and that the standard would be applied across the state.  This position is in accord with the "temporary disability" provision of the Excuse Requirement found in section 23-15-713(d) of the Mississippi Code.

103.    HB 1521, which explicitly allows people to vote absentee if they or those they are caring for are under "physician-imposed quarantine,"  provides no definition for "physician-imposed quarantine," "caring for," or "dependent" in the temporary or permanent physical disability excuse under Mississippi law.  Without clarification, the application of this excuse in conjunction with existing Mississippi absentee ballot law leaves voters uncertain of their ability to vote absentee.  Defendant Watson has requested an official opinion from Defendant Fitch regarding the definition of "physician-imposed quarantine," and whether the qualifying language in Section 23-15-713(d) eliminates circuit clerks' ability to determine what is a "temporary disability" under Mississippi law.  Bobby Harrison, *Watson Asking Attorney General Whether Mississippi Legislature Made it Harder to Vote in Pandemic*, Mississippi Today, July 20, 2020, https://mississippitoday.org/2020/07/20/watson-asking-attorney-general-whether-mississippi-legislature-made-it-harder-to-vote-in-pandemic/.

104.    Despite the existing "temporary disability" excuse and the explicit "physician-ordered quarantine" excuse, Governor Reeves stated in an August 16, 2020 interview that Mississippi would not allow "someone who's afraid of their health, someone with asthma, someone with diabetes, someone who's overweight to send in their ballot by mail" to send in an

Case 3:20-cv-00572-DPJ-FKB   Document 1   Filed 08/27/20   Page 41 of 58

absentee ballot by mail "unless they legally qualify for an absentee ballot—which is certainly allowable under Mississippi state statute." When asked why not allow these voters to qualify based on comorbidities or the fear of contracting the coronavirus, Governor Reeves indicated that this "is not what Mississippi state statute allows for." Interview with Governor Tate Reeves, Face the Nation (August 16, 2020), https://www.cbsnews.com/news/transcript-governor-tate-reeves-on-face-the-nation-august-16-2020/.

105.    In Mississippi's 82 counties, circuit court clerks serve as the registrars, and it is their responsibility to print and provide applications for absentee ballots. *See* Miss. Code Ann. § 23-15-625. In response to a public records request regarding guidance received from Defendant Watson, 27 circuit clerks representing 30 districts replied that the Secretary of State has yet to promulgate policies specifically outlining COVID-19 procedures for absentee voting for the November election. Circuit clerks in various counties are unsure of the procedures under the Excuse Requirement and are providing differing guidance to voters across counties. *See* Anna Kate Doiron, *Requirements to Vote Absentee in the Upcoming General Election Still Undecided*, The Vicksburg Press, Aug. 18, 2020, https://www.vicksburgpost.com/2020/08/18/requirements-to-vote-absentee-in-the-upcoming-general-election-still-undecided/.

106.    The conflicting public information as to the applicability of the Excuse Requirement and Defendant Watson's failure to clarify the situation has led to confusion among voters and has imposed and will continue to impose substantial burdens on voters, including Plaintiffs Parham, Oppenheim, and LWVMS's and MS NAACP's members.

107.    Reflecting this confusion, Mississippi voters in *Oppenheim, et. al. v. Watson, et. al.*, Case No. 25CH1:20-cv-961, filed a declaratory action on August 11, 2020 in state court seeking the meaning of Section 23-15-713(d) in the context of the challenges posed by the COVID-

19 pandemic. The *Oppenheim* Plaintiffs assert that under this Section, absentee voting should be available to any voters with health conditions that put them at higher risk of severe illness or death; any voters who want "to avoid voting in-person at a polling place due to guidance from the MDH [Mississippi State Department of Health], the Centers for Disease Control and Prevention ("CDC"), or other physicians or public health authorities to avoid unnecessary public gatherings during the COVID-19 pandemic;" and any voters "caring for or supporting" voters with pre-existing conditions. *Oppenheim*, Case No. 25CH1:20-cv-961, Compl. at 31.

108.    The failure of Defendant Watson to definitively advise voters that they will be able to vote absentee if they reasonably fear risking contracting coronavirus and exposing themselves to COVID-19 by voting in person unconstitutionally burdens the right to vote because voters are placed in the untenable position of having to choose between (1) voting in person and risking their health; (2) voting absentee and risking prosecution and; (3) not voting at all.

**D.    The Notarization Requirement Significantly Burdens Mississippi Voters Without Meaningfully Advancing Any Valid State Interest.**

109.    Fulfilling Mississippi's Notarization Requirement for mail-in absentee ballots and applications brings its own life-threatening risks during the COVID-19 pandemic, particularly for those with underlying health conditions. Voters will have to leave their homes to obtain the required attestation or notarization on their absentee ballot application and to complete their absentee ballot in front of an authorized witness. *See* Miss. Code Ann. §§ 23-15-631, 23-15-627.

110.    Although Governor Reeves permitted remote notarization for the duration of the State of Emergency in Mississippi, he has not reauthorized such remote notarization. Even if he should reauthorize it, though, this process does not resolve the risks created by the Notarization Requirement because it comes with its own onerous requirements and cannot be used for notarizing the absentee ballot.

111.    To use remote notarization for the absentee ballot application, a voter must have access to video-call technology.  This requires sufficiently high-speed internet access and a device with videoconference capabilities, to which many voters may not have access.  Further, Mississippi has one of highest rates of households without internet access in the United States, and as of 2017, 26.2% of Mississippians do not have access to the internet at home.  Even if voters have access to the technology to use remote notarization, they must then obtain postage and envelopes and mail the absentee application to the notary public for their official stamp and seal before mailing it back to the registrar.  Worse yet, the Governor's prior Executive Order permitted notaries to charge up to $30.00 for performing remote notarization.  Given the lack of guidance regarding the actual cost of remote notarization, voters may be dissuaded from absentee voting due to uncertain costs and economic constraints caused by the COVID-19 pandemic.

112.    Remote notarization does not resolve the problems created by the notarization requirement.  The voter must physically sign their absentee ballot envelope in front of a notary, who must also sign the absentee ballot envelope.  Because the absentee ballot envelope must be present for notarization, the voter must also be present, defeating the benefit of remote notarization for absentee voters.

113.    Additionally, the United States Postal Service announced on August 18, 2020 that postal employees are prohibited from serving as witnesses on voters' absentee ballots while on duty.  James Brooks, *In Rule Change, Postal Service Forbids Employees from Signing Absentee Ballots as Witnesses*, Anchorage Daily News, Aug. 18, 2020, https://www.adn.com/politics/2020/08/18/in-rule-change-postal-service-forbids-employees-from-signing-absentee-ballots-as-witnesses/.  This restriction limits voters' ability to comply with the Notarization Requirement.

114.     Thus, in the middle of a pandemic, voters must choose between entering public establishments and coming into face-to-face contact with notaries or authorized officials to obtain signatures at least twice and losing the "precious" and "fundamental" right to vote. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).

115.     Mississippi's Notarization Requirement will impose substantial burdens on a broad cross-section of the public, including but not limited to voters who have a heightened risk of suffering from COVID-19 like Plaintiff Goggin; voters who live with, care for, or work with individuals who have a heightened risk of suffering from COVID-19; and notaries and other officials authorized to administer oaths.  The Notarization Requirement also burdens voters who are asymptomatic or fear contracting the coronavirus.

116.     Even though the "Safer at Home" order has been lifted, the public health crisis—and the corresponding risks to voters—remains.  The significant burden imposed by the Notarization Requirement is evident when compared with current CDC guidelines for elections. The CDC has recommended that election officials "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations."  Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).  But Mississippi's absentee voting laws do the exact opposite—they necessitate hazardous direct contact in public spaces to obtain a notary seal or attestation signature ***two times*** in the process of obtaining and casting an absentee ballot.

117.     Mississippi's Notarization Requirement for absentee ballot applications and ballots is unrelated to any valid state interest.

118.    Mississippi utilizes other mechanisms that preclude claims that this requirement prevents voter fraud or safeguards voter confidence.  Voters must include identifying information such as the last four digits of their social security number or their driver's license number on their absentee ballot application.  Voters must also sign both their absentee ballot application and ballot envelope under penalty of perjury, and their ballots are subject to challenge as with in-person voting.  Furthermore, the absentee voting structure indicates that notarization of absentee ballots is not necessary for verification purposes, as absentee voters eligible under the temporary or permanent physical disability excuse are simply required to have an adult eighteen (18) years or older witness their application and ballot.

**E.      The Cure Prohibition Significantly Burdens Mississippi Voters Without Meaningfully Advancing Any Valid State Interest and Violates Voters' Due Process Rights.**

119.    In addition, Mississippi statute requires signature matching between the signatures on a voter's absentee application and the signature on the voter's absentee ballot envelope for absentee by mail ballots.  Specifically, Mississippi statute requires that: "The signature on the application . . . be compared with the signature on the back of the envelope."  Miss. Code Ann. § 23-15-639.  If the signatures are found not to match, Mississippi election officials are required to reject the ballot outright.  Miss. Code Ann. § 23-15-641.  There is no provision of Mississippi law that provide for notice of or any opportunity to cure signature deficiencies prior to rejection of the ballot.

120.    Signature matching is a notoriously inaccurate method of verifying an individual's identity.  Handwriting analysis requires controlled conditions and significant, rigorous training to be performed without excessive error.  Election officials are not trained forensic scientists, and

research suggests that election officials are prone to deciding in error that authentic voter signatures do not match signatures on file with local election boards.

121.    As part of this signature-comparison process, Mississippi gives broad authority to election officials to challenge absentee ballots because of a mismatched signature but prescribes no process for doing so.  Neither the Mississippi Code, nor the County Election Manual specifies the number of poll managers who must or may review any given ballot.  This lack of uniform process means that a Mississippi voter might be disenfranchised based on a handwriting analysis performed by a single precinct official, decided according to that official's subjective opinion, and given no further review.  Mississippi law also provides no meaningful guidance on what it means for an official to "compare" the signatures on a ballot envelope and absentee ballot application. Mississippi Secretary of State, 2019 County Elections Handbook at 42 (revised Oct. 2019), https://www.sos.ms.gov/Documents/ElectionsDocuments/County%20Election%20Handbook_10 %202019.pdf.  It provides no meaningful guidance on what it means for those signatures to "correspond."  Miss. Code Ann. § 23-15-641(1).  Furthermore, the statute does not define a "signature."  No Mississippi statute, regulation, or Secretary of State directive specifies how election officials should compare voters' signatures on their ballot envelopes to the signatures on absentee ballot application forms.  Upon information and belief, the Secretary of State does not regularly conduct or organize training for election officials in handwriting analysis or signature matching.  Similarly, no Mississippi law requires that election officials receive any such training.

122.    The risk of disenfranchisement through a false signature-mismatch determination is especially high for elderly, disabled, ill, and non-native English signatories because those populations have higher signature variability, and Mississippi's system requires election officials to compare the signature on a voter's absentee ballot envelope to the signature on the voter's

absentee ballot application form on file with the county board of elections.  Mississippi Secretary of State, 2019 County Elections Handbook at 42 (revised Oct. 2019), https://www.sos.ms.gov/Documents/ElectionsDocuments/County%20Election%20Handbook_10%202019.pdf.  Even trained handwriting analysts require multiple comparison samples to determine whether a signature is authentic.  Natural variations in the voter's signature may emerge or increase between the signature on the ballot application and the ballot envelope.  Especially considering the risk of incorrect mismatch determinations, Mississippi law does not provide voters with notice of the signature discrepancy or the opportunity to cure before rejection of the ballot.

123.    Mississippi law does not provide voters notice and an opportunity to cure absentee ballots that have been rejected due to perceived signature mismatch.  To the contrary, Mississippi places the burden on Mississippi voters to learn the status of their absentee ballot *after* disenfranchisement, only providing voters with "written information to inform the person how to ascertain" whether their ballot was counted or rejected, and if so, the reason for rejection.  *See* Miss. Code Ann. § 23-15-641(5).

124.    The number of voters who will vote by absentee ballot for the November 2020 election will increase substantially due to the COVID-19 pandemic.  It is reasonable to predict that the number of ballots rejected under the Signature Verification Requirement is bound to increase proportionally.  As such, Mississippi voters, including Plaintiff Goggin and the Organizational Plaintiffs' members face an increased rate of rejection of their absentee ballots.

## CLAIMS FOR RELIEF

**Count 1:  During the COVID-19 Crisis, Defendants' Failure To Advise the Public that Mississippi's Excuse Requirement Allows Plaintiffs and Other Voters Reasonably in Fear of COVID-19 To Vote by Absentee Ballot Burdens the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Plaintiffs Parham, Oppenheim, MS NAACP, and LWVMS)**
**(All Defendants)**

125.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

126.    Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the plaintiff's right to vote against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotation marks omitted); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal quotation marks omitted).

127.    The Excuse Requirement, both the "temporary or permanent disability" provision and the explicitly defined "physician-imposed quarantine" provision, allows voters who reasonably fear that voting in-person will put them or others at risk of contracting the coronavirus and suffering from COVID-19, or who follow the guidance of public health officials to quarantine themselves, to vote absentee.

128.    Defendant Watson has failed to advise the public that this is so, and, in fact, has allowed conflicting statements of state officials as to the applicability of the Excuse Requirement to confuse voters as to whether they can vote absentee during the COVID-19 pandemic.

129.    Defendants' failure to advise the public that the Excuse Requirement allows voters in fear of contracting the coronavirus to vote absentee and the confusion emanating from that failure and from the conflicting official statements on the issue impose a significant burden on Mississippi voters' fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.

130.    Defendants' actions and omissions have placed Plaintiffs Parham and Oppenheim and members of the MS NAACP and LWVMS who are qualified Mississippi voters and reasonably fear contracting the coronavirus in the untenable position of potentially violating the law by voting absentee so as to protect their health or of risking their health or the health of their loved ones to cast their ballot in person, or not vote at all.

131.    There is no legitimate state interest that outweighs the burdens placed on Plaintiffs by Defendants' failure to publicly advise voters that they can vote absentee if they reasonably fear contracting the coronavirus by voting in-person.

**Count 2: Alternatively, During the COVID-19 Pandemic, Defendants' Application of the Excuse Requirement Unconstitutionally Burdens the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**(Plaintiffs Parham, Oppenheim, MS NAACP, and LWVMS)**
**(All Defendants)**

132.    Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

133.    If this Court does not find for Plaintiffs on Count 1, then this Court should rule that the Excuse Requirement unconstitutionally burdens the right to vote by denying voters who reasonably fear that voting in-person will increase their risk of exposure to COVID-19.

134.     The Excuse Requirement, if not construed as allowing voters who reasonably fear that voting in person will increase their risk of exposure to COVID-19, imposes a substantial burden on voters who must choose between voting in person and risking their health and their lives, or not voting at all.

135.     This burden is particularly severe on voters like Plaintiffs who include voters with preexisting medical conditions, their caretakers Black voters, and older voters.

136.     There is no countervailing legitimate state interest that outweighs the potentially life-threatening burden on Plaintiffs.

**Count 3: Alternatively, During the COVID-19 Crisis, Defendants' Application of the Excuse Requirement is Unconstitutionally Vague and Denies Plaintiffs' Right to Due Process Under the Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**(Plaintiffs Parham, Oppenheim, MS NAACP, and LWVMS)**
**(All Defendants)**

137.     Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

138.     If the Court does not find for Plaintiffs on Count 1, the Court should declare that the Excuse Requirement is unconstitutionally vague.

139.     A statute violates the Fourteenth Amendment based on vagueness if the terms "fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorize or even encourage arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  Federal courts can refrain from invalidating the statute if the court determines that the statute's vagueness can be cured by a reasonable construction.  *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 822 (5th Cir. 1979).  One such remedy includes the court construing the statute itself if there is "only one plausible saving construction."  *Id.*

140.    Under Mississippi's Excuse Requirement, voters may select temporary or permanent physical disability based on a "physician-imposed quarantine" as an excuse for absentee voting in 2020 elections.  Mississippi is expected to see a historic number of voters choose, for the first time, to vote absentee by mail to further limit exposure to the coronavirus.

141.    The "temporary disability" requirement under the Excuse Requirement should be construed as allowing voters who reasonably fear that voting in person will subject them or others to increased risk of contracting coronavirus and exposure to COVID-19.

142.    Mississippi law does not define "physician-imposed quarantine."   Upon information and belief, Defendants have not provided the floor testimony from Mississippi legislators regarding the meaning and application of the phrase as official guidance to county registrars and the public.

143.    Mississippi law also does not define "dependent" as applied to the Excuse Requirement.   Voters, including Plaintiff Oppenheim, are uncertain of whether the meaning applies to "dependent[s]" for tax purposes or other loved ones for whom they are caretakers.

144.    Defendants' failure to provide official guidance or interpretation creates confusion for Plaintiff Parham and Organizational Plaintiffs MS NAACP's and LWVMS's members, who do not know if they are eligible to vote absentee under the "temporary disability" clause or under the "physician-imposed quarantine" clause in the temporary or permanent physical disability excuse.  Voters who complete the absentee ballot application do so under penalty of perjury and thus risk criminal prosecution if they incorrectly interpret this excuse.

145.    Upon information and belief, Defendants have not provided any guidance to county election officials regarding the Excuse Requirement, HB 1521 implementation, absentee ballot applications, or absentee ballots during the COVID-19 pandemic, including for the upcoming

November election.  Circuit Clerks, therefore, are not able to provide accurate or uniform guidance to voters regarding eligibility for absentee ballots during the COVID-19 pandemic.

146.    Without a conclusive statement from Defendant Watson interpreting the Excuse Requirement to allow all voters to cast an absentee ballot, the Requirement will remain vague under *Grayned*.  Plaintiffs will continue to face deprivation of their due process rights absent interpretation by the Court correcting the Excuse Requirement's constitutional defects.

147.    This Court should declare that the Excuse Requirement is unconstitutionally vague and construe it in a way that is constitutional, i.e., that it allows voters who reasonably fear that voting in person will subject them or others to increased risk of contracting coronavirus and exposure to COVID-19, or who listen to public health authorities and quarantine themselves during the COVID-19 pandemic, to vote absentee.

### Count 4:  During the COVID-19 Crisis, Mississippi's Notarization Requirement Burdens the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983) (Plaintiffs Goggin, MS NAACP, and LWVMS) (All Defendants)

148.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

149.     The Notarization Requirement in the ongoing public health crisis forces Plaintiff Goggin, MS NAACP's and LWVMS's members to enter businesses or public establishments and engage in face-to-face contact, putting them in danger of contracting and potentially dying from the coronavirus.

150.    The Notarization Requirement, particularly as applied during the COVID-19 pandemic, does not advance any state interest sufficiently weighty to justify the resulting burdens

on the right to vote, and it therefore violates the First and Fourteenth Amendments and must be enjoined.

**Count 5: Mississippi's Cure Prohibition Is a Denial of Plaintiffs' Right to Procedural Due Process under the Fourteenth Amendment
(42 U.S.C. § 1983)
(Plaintiffs Goggin, MS NAACP, and LWVMS)
(All Defendants)**

151.     Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

152.     Mississippi has conferred on its eligible citizens a liberty interest in voting by mail, which is protected by the doctrine of procedural due process.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").  At a minimum, procedural due process requires that the State provide the voter pre-deprivation notice *and* an opportunity to be heard before being denied their protected liberty interest.  *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

153.     Defendants' failure to provide absentee voters with notice and an opportunity to cure perceived signature-related deficiencies with their absentee ballot—particularly given the unreliability of signature matching and election officials' unfettered discretion to reject ballots—fails to meet these minimum requirements of procedural due process and is unconstitutional.

154.     The risk of erroneous deprivation caused by the unreliability of signature matching and election officials' unfettered discretion to reject ballots is high.  Without the opportunity to cure, absentee voters might otherwise be deprived of their fundamental right to vote.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

155.    Implementation of procedures to provide absentee voters with notice and an opportunity to cure for signature-related errors would impose only a minimal burden on the State. For example, Mississippi law already provides a notice mechanism for other types of absentee ballot issues, such as when voters include more than one ballot in the ballot envelope, if the affidavit is insufficient, or if the voter is disqualified.  Miss. Code. Ann. §§ 23-15-641 (2), (3).

156.    Voters in Mississippi will continue to face a substantial risk of being deprived of their fundamental right to vote without due process absent relief granted by the Court.

**Count 6:  Mississippi's Cure Prohibition Burdens the Fundamental Right to Vote in
Violation of the First and Fourteenth Amendments
(42 U.S.C. § 1983)
(Plaintiffs Goggin, MS NAACP, and LWVMS)
(All Defendants)**

157.    Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

158.    This fall, Mississippi is expected to see a historic number of voters choose, for the first time, to vote absentee by mail.  This includes voters who meet the challenged Excuse Requirement, whose ballots—among other absentee by mail voters—are subject to state signature match requirements.

159.    Mississippi law does not provide voters with notice of benign or technical signature-related errors, including election officials subjectively believing—without any statutory or regulatory guidance—that the signature accompanying the voter's ballot did not match the signature on their absentee ballot application.

160.    Compounding the harm, the deprivation will occur without an opportunity to cure the issue by any alternative verification method.  Thus, voters whose ballots are rejected for

signature-related errors are effectively disenfranchised.   There is no remedy to rehabilitate infringement on the right to vote once the voter is disenfranchised.

161.   Such a system imposes a significant burden on absentee voters' fundamental right to vote.  The state has no legitimate and relevant state interest sufficiently weighty to justify such a burden.   Rejections will occur without any reliable indication that the rejected ballots were fraudulent or improper.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray that the Court:

a.   Assume jurisdiction over this action;

b.   Declare that the failure of Defendants to advise voters that they are eligible to vote absentee if they reasonably believe that voting in person would risk their contracting the coronavirus and exposure to COVID-19, or risk the health of others, violates the fundamental right to vote under First and Fourteenth Amendments to the U.S. Constitution;

i.   Alternatively, declare that the Excuse Requirement, if construed to *not* allow voters to vote absentee if they reasonably believe that voting in person would risk their contracting the coronavirus and exposure to COVID-19, or the health of others, violates the First and Fourteenth Amendments to the U.S. Constitution;

ii.   Alternatively, declare that the Excuse Requirement is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment and should be construed to allow voters to vote absentee if they reasonably believe that voting in-person would risk their contracting the coronavirus and exposure to COVID-19 or the health of others, or if they are quarantined pursuant to the advice of public health officials;

c.      Declare that the Notarization Requirement violates the fundamental right to vote under First and Fourteenth Amendments to the U.S. Constitution while the risk of community transmission of COVID-19 continues to threaten the health and safety of Mississippi voters;

d.      Declare that Defendants' failure to provide adequate notice and an opportunity to cure the rejection of absentee ballots on the basis of signature mismatch violates the right to vote under the First and Fourteenth Amendments to the U.S. Constitution, and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

e.      Issue preliminary and permanent injunctions that order relief including:

i.   Ordering Defendants to advise voters that the Excuse Requirement will be applied during the COVID-19 pandemic, and specifically in the November election, so as to allow voters to vote absentee if they reasonably believe that voting in person would risk their contracting coronavirus and exposure to COVID-19 or the health of others, or if they are quarantined pursuant to the advice of public health officials;

ii.   Alternatively, ordering Defendants to apply the Excuse Requirement so as to allow voters to vote absentee if they reasonably believe that voting in-person would risk their contracting coronavirus and exposure to COVID-19 or the health of others, or if they are quarantined pursuant to the advice of public health officials;

iii.   Prohibiting Defendants from enforcing the Notarization Requirement for all voters during the COVID-19 pandemic in Mississippi;

iv.   Ordering Defendants to issue guidance instructing all local and county election officials to count otherwise validly submitted absentee ballot applications and validly cast absentee ballots that are missing notarization or the signature of an official authorized to administer oaths;

56

    v.   Ordering Defendants to issue guidance instructing all local and county election officials to count otherwise validly submitted absentee ballot applications and validly cast absentee ballots that are missing notarization or the signature of an official authorized to administer oaths during the COVID-19 pandemic in Mississippi, including the November election;

   vi.   Ordering Defendants to issue guidance instructing all local and county election officials to provide adequate notice and an opportunity to cure rejections of absentee ballots on the basis of perceived signature mismatch;

  vii.   Retain jurisdiction to render any and all further orders that this Court may deem necessary;

 viii.   Award Plaintiffs their reasonable attorneys' fees and costs pursuant to statute; and

   ix.   Grant Plaintiffs such other and further relief as may be just and equitable.

Respectfully submitted this 27th day of August, 2020.

/s/ Jade Morgan

Jade Morgan
MS Bar No. 105760
Leslie Faith Jones*
SOUTHERN POVERTY LAW
CENTER
111 E. Capitol Street, Suite 280
Jackson, MS 39201
P: (601) 317-7519
F: (601) 948-8885
jade.morgan@splcenter.org
leslie.jones@splcenter.org

Caren E. Short*
Nancy G. Abudu*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287

Decatur, GA 30031
P: (404) 521-6700
F: (404) 221-5857
caren.short@splcenter.org
nancy.abudu@splcenter.org

Ezra D. Rosenberg*
Jennifer Nwachukwu*
Ryan Snow*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Phone: (202) 662-8600
Fax: (202) 783-0857
erosenberg@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
rsnow@lawyerscommittee.org

Neil A. Steiner*
Sharon Turret*
DECHERT LLP
1095 6th Avenue
New York, NY 10036
Phone: (212) 698-3500
Fax: (212) 698-3599
neil.steiner@dechert.com
sharon.turret@dechert.com

Julia Chapman*
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2000
Fax: (215) 994-2222
julia.chapman@dechert.com

*Pro hac vice motion forthcoming

**Attorneys for Plaintiffs**