**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| CYNTHIA PARHAM, JED OPPENHEIM, CHERYL GOGGIN, THE LEAGUE OF WOMEN VOTERS MISSISSIPPI, and MISSISSIPPI STATE CONFERENCE OF THE NAACP, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL D. WATSON, JR., in his official capacity as Secretary of State of Mississippi; and LYNN FITCH, in her official capacity as Attorney General of the State of Mississippi, <br><br> Defendants. | Civil Action No. 3:20-cv-572-DPJ-FKB |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

I.      THE DANGERS OF COVID-19 ............................................................................. 3

II.     VOTING IN MISSISSIPPI DURING THE COVID-19 PANDEMIC ........................ 4

        A.      Mississippi's Absentee Voting Excuse Requirements ............................... 5

        B.      Applying for and Casting an Absentee Ballot ......................................... 6

        C.      Mississippi Law Fails To Provide an Adequate System for Notice and
                Cure of Signature Defects of Absentee Ballots. ...................................... 7

                1.      Mississippi Requires Signature Matching as a Prerequisite to
                        Counting Absentee Ballots. ........................................................... 7

                2.      Signature Matching on Absentee Ballot Applications and Absentee
                        Ballots Is Inaccurate ..................................................................... 7

LEGAL STANDARD .......................................................................................................... 8

        A.      Preliminary Injunction Standard .............................................................. 8

ARGUMENT ..................................................................................................................... 9

I.      PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY INJUNCTION ........ 9

II.     PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE
        MERITS OF EACH OF THEIR CLAIMS. ............................................................. 12

        A.      Plaintiffs Are Likely To Succeed on Their Claim that the Excuse
                Requirement Unconstitutionally Burdens Voters' Fundamental Right To
                Vote During the COVID-19 Pandemic. .................................................. 12

                1.      Mississippi's Excuse Requirement Substantially Burdens
                        Plaintiffs' Right To Vote. ........................................................... 13

                2.      Mississippi's Interest in the Excuse Requirement Is Low and Does
                        Not Justify the Burden on Plaintiffs' Right To Vote. .................. 14

        B.      Plaintiffs Are Likely To Succeed on Their Claim that the Notarization
                Requirement Unconstitutionally Burdens Voters' Fundamental Right To
                Vote During the COVID-19 Pandemic. .................................................. 15

                1.      The Notarization Requirement Impermissibly Burdens Plaintiffs'
                        Right To Vote. ........................................................................... 15

                2.      Mississippi's Interest in the Notarization Requirement is Not
                        Sufficient to Justify the Burden on Plaintiffs' Right to Vote ...... 16

        C.      Mississippi's Error Prone Cure Prohibition Violates Plaintiffs'
                Fundamental Right To Vote ................................................................... 17

# TABLE OF CONTENTS
(continued)

**Page**

    1.    Mississippi's Error-Prone Cure Prohibition Procedure Significantly Burdens Plaintiffs' Right to Vote. ............................................................. 17

    2.    Mississippi Has No Legitimate Interest in Depriving Voters of Their Franchise Without Notice and an Opportunity To Cure. ................ 18

  D.  Mississippi's Error-Prone Cure Prohibition Deprives Absentee Voters' Right to Procedural Due Process ......................................................... 19

    1.    Legal Standard. ......................................................................... 19

    2.    Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote. ........................................................................................ 20

    3.    Due Process Requires Mississippi To Provide Voters with Pre-deprivation Notice and an Opportunity to Cure Ballot Signature Impairments. ............................................................................ 21

III.    PLAINTIFFS ARE AT IMMINENT RISK OF IRREPARABLE HARM ..................... 24

  A.  The Excuse Requirement, Notarization Requirement, and Cure Prohibition Will Cause Irreparable Harm Because They Deny or Abridge Plaintiffs' and Their Members' Fundamental Right to Vote .................................. 24

  B.  The Cure Prohibition Will Cause Irreparable Harm Because It Violates Plaintiffs and Their Members' Procedural Due Process Rights ........................ 25

IV.    A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST ............. 25

V.    THE BALANCE OF EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION ................................................................................................ 25

CONCLUSION .................................................................................................. 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allied Home Mortg. Corp. v. Donovan*,
  830 F.Supp.2d 223 (S.D.Tex.2011) ......................................................................9

*Common Cause Rhode Island v. Gorbea*,
  No. 120CV00318MSMLDA, 2020 WL 4460914 (D.R.I. July 30, 2020) .............................13

*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008)......................................................................................12

*Democratic Exec. Comm. of Fla. v. Detzner*,
  347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018), *appeal dismissed as moot sub
  nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
  950 F.3d 790 (11th Cir. 2020) ..................................................................17, 18

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Circ. 2019)...............................................................19, 23

*Fla. Democratic Party v. Detzner*,
  No. 4:16CV607-MW/CAS2016, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)..............19, 22

*Frederick v. Lawson*,
  No. 119-CV-01959, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020) ...........................17, 19

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*,
  415 U.S. 423 (1974)........................................................................................9

*Harper v. Va. State Bd. of Elections*,
  383 U.S. 663 (1966)..................................................................................12, 16

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)......................................................................................11

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1977)......................................................................................10

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ..........................................................................9

*Johnson v. Morales*,
  946 F.3d 911 (6th Cir. 2020) ....................................................................20, 21

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Circ. 2008)..........................................................................21

**TABLE OF CONTENTS**

(continued)

**Page**

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
    No. 6:20-CV-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020)...........................................13

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
    No. 6:20-CV-00024, 2020 WL 4927524 (W.D. Va. Aug. 21, 2020) ......................................19

*Lewis v. Hughs*,
    No. 5:20-CV-00577-OLG, 2020 WL 4344432 (W.D. Tex. July 28, 2020) ......................12, 20

*Martin v. Kemp*,
    341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ....................................................................21, 22

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976) ..........................................................................20

*Murphree v. Winter*,
    589 F. Supp. 374 (S.D. Miss. 1984)....................................................................................25

*O'Brien v. Skinner*,
    414 U.S. 524 (1974)..............................................................................................................22

*O'Donnell v. Harris Cty.*,
    892 F.3d 147 (5th Cir. 2018) ...............................................................................................20

*OCA Greater Houston v. Texas*,
    No. 15-679, 2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) ...................................................24

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) .........................................................................................10, 11

*Oppenheim, et al. v. Watson*,
    Case No. 25CH1:20-CV-00961 ...................................................................................2, 6, 10

*Oppenheim, et. al. v. Watson, et. al.*,
    Case No. 25CH1:20-cv-961 .....................................................................................................6

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ...............................................................................................25

*Perez-Perez v. Adducci*,
    No. 20-10833, 2020 WL 2305276 (E.D. Mich. May 9, 2020) ...............................................24

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..............................................................................................................21

*Richardson, v. Texas Sec. of State*,
    No. SA-19-CV-00963-OLG, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020)...................23, 25

# TABLE OF CONTENTS
### (continued)

**Page**

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 53 (2006) ............................................................................................ 9

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202, 220 (D.N.H. 2018) ................................................ 19, 21, 22

*Spokeo, Inc. v. Robins*,
    136 S.Ct. 1540 (2016) ...................................................................................... 9

*Texas Indep. Party v. Kirk*,
    84 F.3d 178 (5th Cir. 1996) ......................................................................... 12, 13

*Thomas v. Andino*,
    No. 3:20-cv-01552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) ....................... 13, 16, 26

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ........................................................................................ 9

*Voting For America, Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ...................................................................... 12, 13

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ...................................................................................... 20

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ........................................................................... 24

**Statutes**

Miss. Code Ann ........................................................................................... passim

U.S. Constitution ........................................................................................... passim

## **INTRODUCTION**

Unlike any election in modern memory, the November 3, 2020 General Election will be held in the midst of an ongoing public health crisis that has already claimed the lives of more than 193,000 Americans and forced dramatic changes to everyday life across the United States— including in Mississippi.  Plaintiffs Cynthia Parham, Jed Oppenheim, Cheryl Goggin (collectively the "Individual Plaintiffs"), and the League of Women Voters Mississippi ("LWVMS") and Mississippi State Conference of the NAACP ("MS NAACP") (collectively the "Organizational Plaintiffs," and collectively with the Individual Plaintiffs, "Plaintiffs") submit this memorandum of law in support of their motion for a preliminary injunction requiring Defendants to take all action necessary to ensure Plaintiffs and Plaintiffs' members can exercise their fundamental right to vote without risking their health in the midst of the COVID-19 public health crisis.

First, Mississippi's limitations on who may vote by absentee ballot ("Excuse Requirement") unconstitutionally burdens the right to vote in the context of the COVID-19 pandemic because, under the Excuse Requirement, voters who reasonably fear voting in person will increase their risk of exposure to the coronavirus or the risk that they will expose others in their care or with whom they live to the virus are not permitted to vote by absentee ballot.  These voters face the impossible choice between risking their or their loved ones' health and exercising their fundamental right to vote.

Second, Mississippi's requirement that both absentee ballot applications and absentee ballots be notarized ("Notarization Requirement")—not once but twice—is an unconstitutional burden because compliance necessarily involves engaging in close person-to-person contact, increasing the risk of contracting the coronavirus.

Finally, Mississippi's failure to provide voters notice of and the opportunity to cure alleged signature mismatches pursuant to the state's error-prone signature matching procedure

("Cure Prohibition"), deprives voters of their fundamental right to vote and their right to due process.  During the COVID-19 pandemic, significantly more Mississippians are expected to vote absentee than typically have in past elections.  Many will do so for the first time.  As a result, the number of absentee ballots erroneously rejected **without recourse** will climb during the COVID-19 pandemic, including the November election.

Defendants' actions and omissions violate Plaintiffs' fundamental rights to vote and due process.  Plaintiffs seek a preliminary injunction to prevent irreparable harm to Mississippi voters who must choose between casting their ballots and risking their and their loved ones' lives, and an order from this Court[1] declaring that (1) Defendants' application of the Excuse Requirement violates Plaintiffs' fundamental right to vote when they are not allowed to vote absentee by mail during the COVID-19 pandemic if they reasonably fear voting in person will increase their risk of exposure to the coronavirus or the risk that they will expose others in their care or with whom they live to the virus; (2) Mississippi's Notarization Requirement as applied during the COVID-19 pandemic unconstitutionally burdens Plaintiff Goggin's and Organizational Plaintiffs' members' right to vote under the First and Fourteenth Amendments; and (3) Section 23-15-641(1) of the Mississippi Code is unconstitutional as applied because it fails to provide absentee voters with notice of, and an opportunity to cure, signature verification deficiencies, depriving absentee voters of their fundamental right to vote in violation of the First and Fourteenth Amendments and of procedural due process in violation of the Fourteenth Amendment to the United States Constitution.

---

[1] In their Complaint, Plaintiffs also allege that Mississippi's Excuse Requirement is unconstitutionally vague and requires relief from this Court.  In light of the Hinds County Chancery Court's recent decision interpreting the Excuse Requirement, Plaintiffs are not presently seeking a preliminary injunction on that claim. The case, *Oppenheim, et al. v. Watson*, Case No. 25CH1:20-CV-00961, is currently on appeal before the Mississippi Supreme Court.

## FACTUAL BACKGROUND

### I.   THE DANGERS OF COVID-19

The novel coronavirus, SARS-CoV-2, is highly contagious.  *See* Declaration of Arthur L. Reingold, attached Ex. 6, ("Reingold Dec.") ¶ 7.  Once contracted, it can have a range of effects, from no symptoms to a severe immune system response that lead to death.  *Id.* ¶ 6.  The disease poses a severe risk to all individuals, particularly those who are either elderly, or, regardless of age, are immunocompromised or have other underlying conditions like chronic lung disease, diabetes, obesity, or moderate to severe asthma.[2] *Id.* ¶ 6; 10.  While older individuals and those with underlying medical conditions are at greatest risk, the coronavirus has caused the hospitalization and death of individuals of every age.  *Id.*

COVID-19 is particularly dangerous because of its ease of transmission.  *See Id.* ¶¶ 6-7. COVID-19 spreads through respiratory droplets and aerosols that are expelled when an infected individual speaks, coughs, or sneezes near an uninfected individual.  *Id.* ¶¶ 7-8.  It can also spread through the touching of contaminated surfaces, including for example, pens and voting machines. *See id.*  While outwardly sick individuals have been advised to stay home to stop the spread of the disease, asymptomatic and pre-symptomatic individuals can infect others without being aware they themselves are infected.  *Id.* ¶ 10.

The United States has more COVID-19 cases than any other country in the world.  As of September 8, the number of confirmed cases in the United States has surpassed 6.6 million, and at least 196,277 people have died as a result of contracting the coronavirus.[3]  The ease with which

---

[2]    CDC, *People with Certain Medical Conditions* (last updated July 30, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medicalconditions.html.

[3]    CDC, *Coronavirus Disease 2019 (COVID-19): Cases in the US* (last updated September 17, 2020), https://rb.gy/bf6ojt.

the coronavirus spreads will continue to cause "significant community transmission" of the coronavirus "throughout 2020 and into 2021 across the United States."  *See* Reingold Decl. ¶ 15. The current inability to contain the spread of the coronavirus has caused some public health experts to predict the doubling of the US death toll between now and the end of 2020.[4]  Public health experts, including leading White House COVID-19 Task Force member Dr. Anthony Fauci, have also warned that a further resurgence of cases in the fall and/or winter is "inevitable."[5]

There is no cure for the virus that causes COVID-19, and though treatments are under investigation and being used to respond to the crisis on an emergency basis, a vaccine will not be widely available before the November election.  Reingold Dec. ¶ 13.

## II.    VOTING IN MISSISSIPPI DURING THE COVID-19 PANDEMIC

Mississippi saw a surge in COVID-19 over the summer, and is currently confirming more than 200 new coronavirus cases each day.[6]  To date, the coronavirus has infected more than 91,000 Mississippians and resulted in more than 2,750 deaths in the state.[7]  The November election will take place in the midst of this continuing public health crisis.

Historically, most voters in Mississippi must vote in person on Election Day because the ability to vote by absentee ballot is limited to the narrow excuses in the statute.  ECF No. 1 ("Complaint") ¶ 71.  This means physically appearing at a designated polling place, which is a prime area for increased transmission of the coronavirus based on: (1) the close proximity of a

---

[4]    Nurith Aizenman, *300,000 Deaths By December? 9 Takeaways From The Newest COVID-19 Projections*, NPR, (Aug. 6, 2020), https://www.npr.org/sections/health-shots/2020/08/06/900000671/300-000-deaths-by-december-9-takeaways-of-the-newest-covid-19-projections.

[5]    Christina Maxouris, *US Could Be in for 'a Bad Fall and a Bad Winter' If It's Unprepared for a Second Wave of Coronavirus, Fauci Warns*, CNN Health (Apr. 29, 2020), https://rb.gy/xol1oc.

[6]    *See* Mississippi State Department of Health, *COVID-19 in Mississippi*, https://msdh.ms.gov/msdhsite/_static/14,0,420.html#Mississippi (last updated September 17, 2020)

[7]    *Id.*

large number of voters, observers, and poll workers in a limited space; (2) the large number of common surfaces that multiple people touch; and (3) transmission of the virus via both droplet and aerosols and contaminated environmental surfaces.  Reingold Decl. ¶ 7. Indeed, evidence of outbreaks of COVID-19 at polling places in elections held earlier this year is clear epidemiological evidence of the risk of transmission of coronavirus due to in-person voting.  *Id.* ¶ 19.

### A.    Mississippi's Absentee Voting Excuse Requirements.

Mississippi law only allows specific categories of voters with qualifying excuses[8] to vote by absentee ballot.  Unless Mississippi voters satisfy one of the excuses, they must either vote in person on Election Day, or not vote at all.   Recent amendments to Mississippi's Excuse Requirement under HB 1521 provide that voters who are under "a physician-imposed quarantine due to COVID-19 during the year 2020" or "caring for a dependent who is under physician-imposed quarantine due to COVID-19" fall within the existing temporary or permanent physical disability excuse.

The current state of the Excuse Requirement[9] produces nonsensical and dangerous results: An individual with a condition that puts them at increased risk from COVID-19 is permitted to

---

[8]     The excuses permitted by law include: (1) the voter's studies or employment at a school necessitates their absence from the county on Election Day; (2) the voter is an employee of a member of the Mississippi congressional delegation or a spouse or dependent of the employee residing with the absentee voter away from their county of residence; (3) the voter is outside of the county of residence on Election Day; (4) the voter has a temporary or permanent physical disability and who, because of such disability, is unable to vote in person without substantial hardship to himself or others, or whose attendance at the voting place could reasonably cause danger to himself or others; (5) the voter is the parent, spouse, or dependent of a person with a temporary or permanent physical disability who is hospitalized outside the county of residence or more than fifty (50) miles away from his residence and the voter will be with such person on Election Day; (6) the voter is sixty-five (65) years of age or older; (7) the voter is a member of the Mississippi congressional delegation absent from Mississippi on Election Day, or the spouse or dependents of the member of the congressional delegation; or (8) the voter is required to be at work on Election Day during the times at which the polls will be open.  Miss. Code Ann. § 23-15-713.

[9]     On September 2, 2020, the Hinds County Chancery Court issued an order in *Oppenheim, et. al. v. Watson, et. al.*, Case No. 25CH1:20-cv-961, finding that voters with pre-existing conditions and therefore at higher risk of severe illness or death due to COVID-19 qualify as temporarily or permanently disabled,

vote by absentee ballot to protect themselves from the risks posed by in-person voting, but their dependent or caretaker—with whom that voter is inevitably in close contact—is not.  Nor can other voters who reasonably fear contracting the coronavirus and are following public health guidance to avoid in-person interactions during the pandemic, even though any person can be at risk of severe complications from COVID-19.  *See* Reingold Decl. ¶ 6.

### B.    Applying for and Casting an Absentee Ballot

To vote by absentee ballot, a voter may make a request for an absentee application orally, in writing, or by calling the circuit clerk's office.  Miss. Code Ann. §§ 23-15-627, 23-15-657. Notably, the absentee ballot application includes a warning in boldface that making a "false statement" on an absentee ballot application and selling one's vote is punishable with a fine of up to $5,000 and a state prison sentence of up to five years.  *Id.* § 23-15-627.  All absentee ballot applicants, except those who are "temporarily or permanently disabled" must have their application "notarized or signed by an official authorized to administer oaths for absentee balloting" (the "Notarization Requirement").  *Id.*  Both notarization and officials' attestation are typically conducted in-person, requiring close contact between the individual receiving the notarization/attestation and the notary or attesting official.  After receiving a properly completed and notarized absentee ballot application, "the registrar shall send to such absent voter a proper

---

per Mississippi Code § 23-15-713(d), and are therefore permitted to vote absentee during the COVID-19 pandemic, "to the extent that such pre-existing 'physical…condition impairs, interferes with, or limits a person's ability to engage in certain tasks or actions or participate in typical daily activities and interactions' or an 'impaired function or ability' that interferes thereof." *Oppenheim*, Case No. 25CH1:20-cv-961, Order at 14. Their caretakers or dependents, however, are not. *Id.* The *Oppenheim* court also held that Mississippi voters (or the dependent of Mississippi voters) who have been instructed to avoid in-person interactions to because of the possibility of contracting COVID-19 due to the individual or their dependent's physical disability satisfy the excuse requirement set forth in Mississippi Code § 23-15-713(d). *Id.* at 14-15. Finally, the *Oppenheim* court found that Mississippi Code § 23-15-713(d) does *not* permit Mississippi voters to vote absentee if they wish to avoid voting in-person interactions based on guidance from the Mississippi State Department of Health (MDH), Center for Disease Control (CDC), or other public health authorities to "avoid unnecessary gatherings during the COVID-19 pandemic." *Id.*

absentee voter ballot within twenty-four (24) hours" of having received a notarized application, or "as soon thereafter as the ballots are available."  Miss. Code Ann. § 23-15-715(a)-(b).  The voter must then find a "postmaster," "postal supervisor," or "other officer having authority to administer an oath" to act as a witness and watch them complete the ballot envelope. *Id.* § 23-15-631.  Eligible absentee voters under the temporary or permanent physical disability excuse must have a witness eighteen years of age or older sign both their absentee ballot application and ballot envelope.  *Id.*

 C. **Mississippi Law Fails To Provide an Adequate System for Notice and Cure of Signature Defects of Absentee Ballots.**

 1. **Mississippi Requires Signature Matching as a Prerequisite to Counting Absentee Ballots.**

Once the absentee ballot is received, election officials—who are not required to be trained in handwriting analysis—must then "compare[]" the signature on the absentee ballot application with the signature on the back of the absentee ballot envelope.  Miss. Code Ann. § 23-15-639(b).  If election officials determine that the signatures "correspond," the absentee ballot will be counted. *Id.* §§ 23-15-639(b), (c).   If, however, election officials find, for whatever reason, that the signatures do not match, the ballot is rejected.  *Id*. § 23-15-641(1).  There is no meaningful guidance on what it means to "compare[]" the signature or what it means for signatures to "correspond." Mississippi law does not provide voters either *notice* of a signature mismatch nor an opportunity to cure the signature mismatch.  To the contrary, Mississippi provides voters only "written information to inform the person how to ascertain" whether their ballot was counted or rejected, and if so, the reason for rejection.  *See* Miss. Code Ann. § 23-15-641(5).

 2. **Signature Matching on Absentee Ballot Applications and Absentee Ballots Is Inaccurate.**

Signature matching is a notoriously flawed practice.  "Determining whether a signature is genuine is a difficult task for even a trained [Forensic Document Examiner]," and laypeople "had

significantly higher error rates than experts in determining signature authenticity."  Declaration of Linton A. Mohammed, attached Ex. 2, ("Mohammed Decl.") ¶¶ 23; 51.

The risk of absentee ballot through a false signature-mismatch determination is especially high for elderly, disabled, ill, and non-native English signatories because those populations have higher signature variability, and natural variations in the voter's signature may emerge or increase between the signature on the ballot application and the ballot envelope.  *See id.* ¶¶ 24-25; 29; 32; 41.  A person's signature may vary between signings for any number of unintentional reasons, including factors like advancement in age, change in physical or mental condition, disability, stress, or even changes in the writing surface or implement the voter used.  *See id.* ¶ 40.

The number of voters who will vote by absentee ballot for the November 2020 election will increase substantially due to the COVID-19 pandemic.  *See* Declaration of Dr. Marc Meredith, attached Ex. 3, ("Meredith Decl.") ¶ 2.  As such, Mississippi voters, including Plaintiff Cheryl Goggin[10] and the Organizational Plaintiffs' members face an increased rate of rejection of their absentee ballots.

## **LEGAL STANDARD**

### A.     **Preliminary Injunction Standard**

To obtain a preliminary injunction, a plaintiff must establish: (a) a substantial likelihood of success on the merits; (b) a substantial threat of immediate and irreparable harm if the injunction is not issued; (c) that the threatened harm outweighs any harm that would come from the

---

[10]   Ms. Goggin is 72 years old and is therefore permitted to vote by absentee ballot under Mississippi's Excuse Requirement.  *See* Ex. 1, Declaration of Cheryl Goggin ("Goggin Dec.") ¶ 3.

injunction, and (d) that the injunction will not undermine the public interest.  *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

Movants bear the burden of demonstrating that preliminary injunctive relief is warranted, *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 441 (1974), but they are "not required to prove [their] case in full at a preliminary-injunction hearing."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Nor does a movant need to show it is certain to succeed in the action.  *Janvey*, 647 F.3d at 596.  "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."  *Allied Home Mortg. Corp. v. Donovan*, 830 F.Supp.2d 223, 227 (S.D.Tex.2011) (quotation omitted).

## ARGUMENT

### I.      Plaintiffs Have Standing to Seek a Preliminary Injunction

To satisfy the Article III standing requirement, a plaintiff must have "(1) suffered an injury in fact, (2), that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 56-61 (1992). The "presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 53 (2006).

The Individual Plaintiffs have standing. Plaintiffs Parham is unsure whether she is eligible to vote absentee under the current application of the Excuse Requirement, as voting in person increases the risk of exposure to COVID-19 for herself and her husband. Due to various health conditions, both Ms. Parham and her husband are high risk for severe complications from COVID-19 and need to vote by absentee ballot during the COVID-19 pandemic.  *See* Declaration of

Cynthia Parham, attached Ex. 5 ("Parham Dec.") ¶¶ 6-7, 14, 17.  Plaintiff Oppenheim is ineligible to vote absentee under the current application of the Excuse Requirement, though Plaintiff Oppenheim's wife, pursuant to *Oppenheim, et al. v. Watson*, Case No. 25CH1:20-CV-00961, may be permitted to vote by absentee ballot given the risks in-person voting poses to her health, and therefore, must either choose to vote in-person, potentially exposing his high-risk family members to COVID-19, or forgo his right to vote entirely. *See* Accompanying Declaration of Jed Oppenheim Dec., attached Ex. 4 ("Oppenheim Dec.") ¶¶ 6-8, 11, 14-16. Plaintiff Goggin is eligible to vote absentee by mail in Mississippi, making her absentee ballot application and ballot envelope subject to the Notarization Requirement and Cure Prohibition. Goggin Dec. ¶¶ 8-12, 14-18.

Plaintiffs MS NAACP and LWVMS also have standing to seek a preliminary injunction. An organization can demonstrate standing in two ways: *associational standing* and *organizational standing. See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). An organization has *associational* standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). An organization that establishes associational standing can bring suit on behalf of its members even in the absence of injury to itself. *Id.* at 342.

An organization can also establish *organizational* standing "it 'meets the same standing test that applies to individuals.'" *OCA-Greater Houston*, 867 F.3d at 610 (*quoting Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). If an organization diverted resources to respond to the allegedly unlawful action, or if the challenged action resulted in a tangible frustration of the organization's mission, that organization has standing to bring suit. *See*

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Organizational standing "does not depend on the standing of the organization's members." *OCA-Greater Houston*, 867 F.3d at 610.

As set forth more fully in the attached declarations, LWVMS and MS NAACP have standing to challenge the actions at issue both on behalf of its members and on their own behalf. Both organizations have members who: (1) reasonably fear exposure to COVID-19 and are uncertain as to whether they are eligible to vote absentee under the Excuse Requirement; (2) are eligible to vote absentee by mail and must comply with the Notarization Requirement; and (3) are eligible to vote absentee by mail, and thus are subject to the Cure Prohibition. *See* Accompanying Declaration of Christy Wheeler on Behalf of League of Women Voters of Mississippi, attached Ex. 7 ("LWVMS Dec."), ¶¶ 16-18.; Declaration of Corey Wiggins on Behalf of Mississippi Conference of the NAACP, attached Ex. 8 ("MS NAACP Dec.") ¶¶ 11-12. LWVMS and MS NAACP will also be forced to continue to divert resources from their 2020 initiatives if the Excuse Requirement is narrowly construed, which will irreparably reduce legally designated charitable funds and negatively impact their ability to conduct voter outreach. Among other initiatives, LWVMS has contacted ten circuit clerks to obtain information on the implementation of HB 1521, developed a voter guide on how Mississippi voters can protect their health during the pandemic, and begun recruiting poll workers. LWVMS Dec. ¶¶ 19-25. MS NAACP has engaged in voter education programming specifically on the Excuse Requirement and absentee voting during the COVID-19 pandemic and is preparing the statewide Election Protection program for an increase in calls and questions on how to vote absentee during the pandemic. MS NAACP Dec. ¶¶ 8-13.

II.     **Plaintiffs Have a Strong Likelihood of Success on the Merits of Each of Their Claims.**

A.      **Plaintiffs Are Likely To Succeed on Their Claim that the Excuse Requirement Unconstitutionally Burdens Voters' Fundamental Right To Vote During the COVID-19 Pandemic.**

The right to vote is "precious" and "fundamental." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).  The Supreme Court has created a "balancing test" for evaluating challenges to voting restrictions under the First and Fourteenth Amendments fundamental right to vote doctrine: the *Anderson-Burdick* framework. *Voting For America, Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–91 (2008)).  Under *Anderson-Burdick*, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996).

"The level of scrutiny applied to the [s]tate's justification varies based on the severity of the restrictions imposed on the right to vote." *Lewis v. Hughes*, No. 5:20-CV-00577-OLG, 2020 WL 4344432 at *12 (W.D. Tex. July 28, 2020) (citing *Burdick*, 504 U.S. at 434).  Under this flexible standard, "[i]f the burden is great, the State must provide a compelling state interest and narrow tailoring of its rule. If the burden is slight, legitimate state interests will be sufficient" to support the provision's constitutionality. *Texas Indep. Party*, 84 F.3d at 184.  "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (Stevens, J., controlling opinion) (internal quotation marks omitted).

After determining the severity of the burden imposed by the challenged restrictions, courts must "'identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule,'" weighing "'the character and magnitude'" of the harm to the plaintiff's constitutionally protected rights with "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Voting For America, Inc.*, 732 F.3d at 387-88 (quoting *Burdick*, 504 U.S. at 434).

### 1.   Mississippi's Excuse Requirement Substantially Burdens Plaintiffs' Right To Vote.

The burden imposed by the Excuse Requirement is substantial because it "forces voters to make the untenable. . . choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease." *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329, at *17 n.20 (D.S.C. May 25, 2020) (finding that absentee voting is constitutionally protected when it "impacts voters' fundamental right to vote," including "during [the COVID-19] pandemic"); *see also League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) ("*LWVV*").

The Excuse Requirement's burdens during the COVID-19 pandemic are also substantial because they make it impractical for individuals to "maintain a minimum of six feet from those outside their household" when they vote at over-crowded polling sites on Election Day. *LWVV*, 2020 WL 2158249, at *1; *Common Cause Rhode Island v. Gorbea*, No. 120CV00318MSMLDA, 2020 WL 4460914, at *1 (D.R.I. July 30, 2020). In the context of the COVID-19 pandemic, the Excuse Requirement presents a structural barrier to accessing a right "of the most fundamental significance in our constitutional system." *Texas Indep. Party*, 84 F.3d at 182*; see also Thomas*, 2020 WL 2617329, at *17 n.20 ("[D]uring this pandemic, absentee voting is the safest tool [for]

-13-

voters . . . *to effectuate* their fundamental right to vote.  To the extent access to that tool is unduly burdened, [it] effectively [denies] the franchise. . . .").  "Some Mississippi potential voters will only vote absentee by mail because they face high personal health risks if they become infected with COVID-19"—"but they are not currently eligible for an absentee by mail ballot" depending on the construction of the Excuse Requirement.  Meredith Decl. ¶ 37.

The application of the Excuse Requirement forces Mr. Jed Oppenheim, whose wife and mother-in-law are at a high-risk for severe complications of COVID-19, to either vote in-person and risk exposing his wife and mother-in-law to a potentially deadly disease, or forego voting entirely to protect their health.  *See* Oppenheim Decl. ¶ 14-16; *see also* Reingold Decl. ¶ 17 (explaining risk of transmission at polling places).  And Plaintiff Parham, who is at risk of severe complications from COVID-19 (as is her husband) must as well. Organizational Plaintiffs MS NAACP and LWVMS have members who, at a high risk for severe complications (and potential death) from COVID-19 due to their age and race will be faced with the choice between exercising their right to vote or protecting their health.  *See* MS NAACP Decl. ¶ 12; LWVMS Decl. ¶ 11. Thus, the burden imposed on Plaintiffs' right to vote by the Excuse Requirement is substantial.

### 2. Mississippi's Interest in the Excuse Requirement Is Low and Does Not Justify the Burden on Plaintiffs' Right To Vote.

By compelling voters to either risk exposure to a potentially fatal illness or forego voting in the November election entirely, the Excuse Requirement creates a potentially life-or-death choice for Plaintiffs Parham, Oppenheim, and the members of Organizational Plaintiffs MS NAACP and LWVMS.  This substantial burden outweighs any possible discernible state interest.

Any purported state interest in the Excuse Requirement cannot meet constitutional muster in the age of COVID-19.  While in person voting may, during normal times, be preferable to voting via absentee ballot, there is no legitimate governmental interest weighty enough to mandate that

people vote in person when they fear contracting the coronavirus by doing so.  Reingold Decl. ¶ 22.  Further, there is no relationship between the Excuse Requirement and preventing voter fraud or protecting election integrity; there is minimal risk of voter fraud by adopting expanded absentee ballot access.  *See* Meredith Decl. ¶ 59.  Finally, Mississippi is one of just *six* states in the country that requires an excuse to vote during the pandemic and only one of *two* states that does not permit a reasonable fear of COVID-19 as an excuse to vote absentee,[11] demonstrating that free, fair, and safe elections can be had during the COVID-19 pandemic without such an onerous requirement. Accordingly, Mississippi's Excuse Requirement fails under the *Anderson-Burdick* framework.

**B.     Plaintiffs Are Likely To Succeed on Their Claim that the Notarization Requirement Unconstitutionally Burdens Voters' Fundamental Right To Vote During the COVID-19 Pandemic.**

**1.     The Notarization Requirement Impermissibly Burdens Plaintiffs' Right To Vote**.

Mississippi's Notarization Requirement places a substantial burden on the right to vote by forcing Plaintiff Goggin and the Organizational Plaintiffs' members to enter businesses or public establishments and engage in face-to-face contact, putting them in danger of exposure to COVID-19.  The Notarization Requirement also imposes substantial burdens on a broad cross-section of the public, including voters who have a heightened risk of suffering severe complications from COVID-19 like Plaintiff Goggin; voters who live with, care for, or work with individuals who have a heightened risk of suffering severe complications from COVID-19; voters who are asymptomatic or have a fear of contracting the coronavirus; and notaries and other officials authorized to administer oaths.  "Mississippi is the only state that requires a voter to have two

---

[11] *See* National Council of State Legislatures, *Absentee and Mail Voting Policies in Effect for the 2020 Election*, available at https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx (September 14, 2020).

documents witnessed in-person in order to cast an absentee ballot."  Meredith Decl. ¶ 21.  Just as the Excuse Requirement forces a voter to decide between exercising their fundamental right to vote and risk of contracting the coronavirus, *see* Section III.A *supra*, so does the Notarization Requirement.  *See Harper,* 383 U.S. at 670.

> **2.      Mississippi's Interest in the Notarization Requirement is Not Sufficient to Justify the Burden on Plaintiffs' Right to Vote.**

Any state interest in the Notarization Requirement does not justify its corresponding burden on voters.  Although notarization requirements are typically justified by an in protecting election integrity, there is no evidence that a notarization requirement applied to certain categories of absentee voters advances the state's interest in protecting against voter fraud.  *See Thomas*, 2020 WL 2617329, at *20 ("While states certainly have an interest in protecting against voter fraud and ensuring voter integrity, the interest will not suffice absent 'evidence that such an interest made it necessary to burden voters' rights.'") (quoting *Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020)).  Mississippi utilizes other mechanisms that prevent voter fraud, including requiring identifying information on the absentee ballot application, requiring voters to sign both their absentee ballot application and ballot envelope under penalty of perjury; and subjecting absentee ballots to challenge  Furthermore, notarization of other absentee by mail ballots is not necessary for verification purposes given that absentee voters eligible under the temporary or permanent physical disability excuse are not required to secure notarization.  Further, "there is no evidence that voter fraud will increase in the 2020 presidential election if…the identities of absentee by mail voters are verified using a method that does not require a voter to have two in-person interactions." Meredith Decl. ¶ 4.

Mississippi, therefore, cannot identify any interest weighty enough to justify the significant burden imposed on absentee voters by the Notarization Requirement.  Accordingly, Mississippi's Notarization Requirement fails under the *Anderson-Burdick* framework.

### C.   Mississippi's Error Prone Cure Prohibition Violates Plaintiffs' Fundamental Right To Vote.

#### 1.   Mississippi's Error-Prone Cure Prohibition Procedure Significantly Burdens Plaintiffs' Right to Vote.

Mississippi's error-prone Cure Prohibition completely disenfranchises voters whose absentee ballots are erroneously rejected because of signature mismatches because they are not provided with notice of or an opportunity to cure any mismatch before their vote is discarded.  This is a substantial burden.  See *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018), *appeal dismissed as moot sub nom. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790 (11th Cir. 2020) (finding that signature match procedure without opportunity to cure violated the *Anderson-Burdick* test).  Even if the Cure Prohibition procedures mean "a comparatively small number of voters are likely to be disenfranchised based on a signature mismatch each election cycle," courts have found that they violate the right to vote.  *See Frederick v. Lawson*, No. 119-CV-01959, 2020 WL 4882696, at *16 (S.D. Ind. Aug. 20, 2020).

The risk of erroneous deprivation caused by the unreliability of signature matching and election officials' discretion to reject ballots is high.  Laypersons—like the election officials responsible for signature evaluation— "are more than 3 ½ times more likely to declare an authentic signature non-genuine—which, in the case of signatures on mail-in ballots and ballot applications, would mean that election officials would reject more than 3 ½ times the number of ballots and applications than [Forensic Document Examiner]s."  Mohammed Dec. ¶ 34.  Laypersons had a 19.3% rate for signature matching, and it "can safely be assumed that the error rate will rise when

-17-

inadequate comparison samples and time are available to the screener." *Id.* ¶ 36.  Likewise, for

older members of the Organizational Plaintiffs, or those with underlying health conditions, it is

basically impossible to produce a consistent signature, meaning the risk of deprivation is only

multiplied.  *See id.* ¶ 41.  This risk is heightened for the November election, where COVID-19 will

lead more voters to vote absentee by mail than ever before because of a reasonable fear that contact

with others on Election Day may increase their risk of contracting the coronavirus.

The inherently problematic practice of signature matching cannot be applied without the

opportunity to cure.  *Detzner*, 347 F. Supp. 3d at 1030–31 ("Vote-by-mail voters, in this election,

were not notified of a signature mismatch problem until it was too late to cure… Without this

Court's intervention, these potential voters have no remedy. Rather, they are simply out of luck

and deprived of the right to vote.).  Mississippi law, however, provides voters with neither notice

of a signature mismatch nor the opportunity to cure the mismatch.  *See* Miss. Code Ann. § 23-15-

641(5).  This satisfies the need to establish a substantial burden on Plaintiffs' fundamental right to

vote under *Anderson-Burdick*.

> **2.     Mississippi Has No Legitimate Interest in Depriving Voters of Their Franchise Without Notice and an Opportunity To Cure**.

Mississippi's flawed Cure Prohibition does not serve any plausible state interest in election

integrity, nor does it outweigh the burden placed on Plaintiffs and their members by failing to

institute notice and cure procedures that safeguard the right to vote.  First, the existing signature

verification process is not needed to address theoretical voter confusion or fraud. For example,

Virginia held an election in May that required a witness signature on absentee ballots, while the

June election did not.  And yet "[e]very indication before the Court is that the June primary was

conducted without the witness signature requirement and without any corresponding increase in

voter confusion or election fraud—the [intervenor] has not provided any evidence to the contrary

and no state official or entity has come forth to intervene or file an amicus brief expressing otherwise." *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 4927524, at *14 (W.D. Va. Aug. 21, 2020).

Likewise, Defendants' failure to provide voters with an opportunity to cure any perceived signature mismatch demonstrates that the current system is not sufficiently weighty to justify the state's interest.  In fact, signature *validation* would advance the state's goals and affirm public confidence in the election.  *See Frederick*, 2020 WL 4882696, at *15; *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 220 (D.N.H. 2018); *Fla. Democratic Party v. Detzner*, No. 4:16CV607-MW/CAS2016, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016) ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted."). Mississippi's inherently unreliable system, on the other hand, directly undermines public faith in elections.  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1324 (11th Circ. 2019) ("[V]ote-by-mail voters who followed the ostensible deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness . . . .").  Mississippi's interests in the Cure Prohibition do not outweigh the burden placed on the fundamental right to vote, and Mississippi's scheme therefore fails under *Anderson-Burdick*.

### D.     Mississippi's Error-Prone Cure Prohibition Deprives Absentee Voters' Right to Procedural Due Process

#### 1.     Legal Standard.

In determining whether a challenged state action violates due process, courts engage in a "two step inquiry," inquiring (1) whether the plaintiff has protected liberty or property interest with which the state has interfered, i.e., whether due process applies, and (2) whether the

procedures related to the deprivation were constitutionally sufficient, i.e., what process is due. *O'Donnell v. Harris Cty.*, 892 F.3d 147, 157 (5th Cir. 2018).  To make the latter determination, courts apply the three-factor test announced by the United States Supreme Court in *Matthews v. Eldridge*, balancing: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."  *Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020) (quoting *Matthews*, 424 U.S. 319, 335 (1976)).

## 2. Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote.

The right to vote in Mississippi is protected by the doctrine of procedural due process, as all voters have a liberty interest stemming from both the United States Constitution, the Mississippi Constitution, and state law.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies."); *see also Lewis,* 2020 WL 4344432, at *15 (finding a protected liberty interest in the right to vote and holding that "Plaintiffs have adequately alleged a due process claim against the Signature Match Requirement"); *Democracy N. Carolina*, No. 1:20-CV-457, 2020 WL 4484063, at *53 (M.D.N.C. Aug. 4, 2020) ("The right to vote is a constitutionally protected liberty interest").

To effectuate the fundamental right to vote, Mississippi permits eligible voters a statutory right to vote by mail if the voter meets one of the eligibility requirements under Section 23-15-713 of the Mississippi Code.  In doing so, Mississippi has provided its eligible citizens with a protected liberty interest which cannot be deprived without due process.  *Lewis*, 2020 WL 4344432, at *15.

But even without such legislative authority, the United States and Mississippi Constitutions[12] grant the fundamental right to vote as well, establishing a liberty interest.  *See Democracy N. Carolina*, 2020 WL 4484063, at *53.  An eligible voter's interest in casting an absentee ballot by mail extends to having it counted on equal terms with other voters.  *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Circ. 2008); *see also Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) ("The right to vote includes the right to have the ballot counted.").

### 3.    Due Process Requires Mississippi To Provide Voters with Pre-deprivation Notice and an Opportunity to Cure Ballot Signature Impairments.

Mississippi may not arbitrarily disenfranchise citizens who avail themselves of its absentee voting system  *See Saucedo*, 335 F. Supp. 3d at 217 ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted."). Rather, the rule is that due process "requires some kind of a hearing before the State deprives a person of liberty or property," and the balancing test set forth in *Eldridge* shapes that inquiry.  *See Johnson*, 946 F.3d at 922 (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (collecting cases)).

The first *Eldridge* factor weighs heavily in Plaintiffs' favor. Courts hearing similar challenges to procedurally deficient signature-matching regimes have found that the first *Eldridge* factor strongly favors the Plaintiffs because of the foundational importance of voting rights. *See, e.g.*, *Self Advocacy Sols. N.D.*, No. 3:20-CV-00071, 2020 WL 2951012, at *9 (D.N.D. June 3, 2020) ("North Dakota's decision to allow voting via absentee ballot requires the state to administer the system constitutionally") (internal quotation marks and citations omitted); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) (finding that "the private interest at issue implicates

---

[12] The right to vote is codified in Section 241 of the Constitution of the State of Mississippi.  .

the individual's fundamental right to vote and is therefore entitled to substantial weight"); *Saucedo*, 335 F. Supp. 3d at 217 (according the private interest factor "significant weight" given the constitutional significance of voting rights). Indeed, here, the weight of this interest is amplified because mail-in voting will be functionally the ***only*** means available to many voters to safely exercise their constitutional right to vote. *See supra* Factual Background; *cf. O'Brien v. Skinner*, 414 U.S. 524, 530 (1974).

The second *Eldridge* factor—the probable value of additional process in reducing the risk of erroneous deprivations—also favors Plaintiffs.  As discussed herein, laypersons are notoriously poor at accurately matching signatures compared to expert.  *See* Mohammed Decl. ¶ 23; 52. Election officials "lack the tools and training to properly account for signature variation, which leads to erroneous mismatch determinations that are particularly pronounced in populations with greater signature variability, such as the elderly, disabled, individuals suffering from poor health, young voters (18-21), and non-native English speakers." *Id*. ¶ 25.

Nevertheless, Mississippi voters will have their valid ballots erroneously rejected based on the untrained determination of election officials, regardless of whether a mismatch is real or perceived.  *See* Miss. Code Ann. § 23-15-641(1); *Fla. Democratic Party*, 2016 WL 6090943, at *6 (stating "[i]f disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does").  Then, voters are denied the opportunity to cure the perceived deficiency with their signature and have their vote counted.

Pre-deprivation notice and an opportunity to cure perceived mail-in ballot deficiencies are necessary to lower the risk of erroneous disenfranchisement.  *See Martin*, 341 F. Supp. 3d at 1339 (holding that "permitting an absentee voter to resolve an alleged signature discrepancy . . . has the very tangible benefit of avoiding disenfranchisement"); *Saucedo*, 335 F. Supp. 3d at 219; *Self*

*Advocacy Sols.*, 2020 WL 2951012 at \*9 (finding that "[b]ecause there is no possibility of meaningful post-deprivation process when a voter's ballot is rejected (there is no way to vote after an election is over, after all), sufficient pre-deprivation process is the constitutional imperative"). Given the high risk of erroneous deprivations and the indisputable effectiveness of the simple notice-and-cure procedure Plaintiffs seek, the second *Eldridge* factor favors granting relief.

The third *Eldridge* factor also favors Plaintiffs. Defendants have no interest in depriving any eligible voter of the fundamental right to have their vote counted. Mississippi law already provides for formal notice procedures when a voter submits two ballots in the same envelope, and notice and an opportunity to cure affidavit ballots cast when a voter does not provide proper photo identification at a polling place. *See* Miss. Code Ann. § 23-15-641(2); Mississippi Code § 23-15-573. These procedures provide a blueprint for Cure Provision, such that the state can adopt procedures to ensure that voters can cure ballots rejected because of signature discrepancies.

The failure to provide pre-deprivation notice and opportunity to cure is inconsistent with any proffered interest in preventing voter fraud. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1327; *see also Richardson*, *v. Texas Sec. of State*, No. SA-19-CV-00963-OLG, 2020 WL 5367216, at \*29 (W.D. Tex. Sept. 8, 2020) ("In sum, it is clear that the Secretary's legitimate interest in preventing voter fraud actually weighs *in favor* of the implementation of additional procedural safeguards."). Procedural due process requires that Defendants, with respect to the Cure Prohibition, (1) adopt uniform standards, training, and education for elections officials around signature matching and (2) require that voters receive the opportunity to cure before elections administrators reject their ballots. *See Saucedo*, 335 F. Supp. 3d at 220; *see also Self Advocacy Sols.*, 2020 WL 2951012 at \*10 (noting that "allowing voters to verify the validity of their ballots

demonstrable advances—rather than hinders—these goals [of preventing voter fraud and upholding the integrity of elections")].

## III.   PLAINTIFFS ARE AT IMMINENT RISK OF IRREPARABLE HARM

### A.   The Excuse Requirement, Notarization Requirement, and Cure Prohibition Will Cause Irreparable Harm Because They Deny or Abridge Plaintiffs' and Their Members' Fundamental Right to Vote

The violation of a citizen's right to vote is the quintessential irreparable injury justifying a preliminary injunction.  *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *OCA Greater Houston v. Texas*, No. 15-679, 2016 WL 4597636, at *4 (W.D. Tex. Sept. 2, 2016) (finding the loss of the right to vote "cannot be undone with monetary relief").

Here, if the Excuse Requirement is not construed to include reasonable fear of contracting the coronavirus, it would force "unnecessary exposure to COVID-19" and therefore "provides a basis to find that [Plaintiffs] will suffer irreparable injury" by forcing voters to choose between the right to vote and their health.  *Perez-Perez v. Adducci*, No. 20-10833, 2020 WL 2305276, at *8 (E.D. Mich. May 9, 2020).   Regardless of any safety measures, in-person voting will force Plaintiffs to put themselves and their families at risk of potentially deadly infection to vote.  *See* Reingold Dec. ¶ 18; 20. Further, with respect to the Organizational Plaintiffs, their members will also have to risk their health or the health of their loved ones and communities to cast a ballot on Election Day.  Indeed, "[a]ll people are susceptible to and capable of getting COVID-19 because of the ease with which it spreads."  Reingold Dec. ¶ 7.  Mississippi's Notarization Requirement likewise forces voters, such as Plaintiff Goggin and Organizational Plaintiffs' members who are permitted to vote by absentee ballot, to leave their homes ***twice*** to engage in close face-to-face contact to obtain proper signatures under the Notarization Requirement, or forgo their right to vote.

Finally, Mississippi's Cure Prohibition of absentee ballots will lead to irreparable harm. As explained above, absent injunctive relief Individual Plaintiffs, members of Organizational

Plaintiffs, and other eligible Mississippi voters face total disenfranchisement because they will not have the ability to cure an erroneous signature mismatch on their absentee ballot.

> **B.      The Cure Prohibition Will Cause Irreparable Harm Because It Violates Plaintiffs and Their Members' Procedural Due Process Rights**

For the reasons explained above, Individual Plaintiffs and Organizational Plaintiffs' members are likely to suffer irreparable harm to their constitutional rights if Mississippi's Cure Prohibition, absent notice of the opportunity to cure any alleged mismatch, remains in place during the COVID-19 pandemic, because Plaintiffs risk total deprivation of their right to vote.  *See Richardson*, 2020 WL 5367216, *36.

## IV.      A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

An injunction would ensure that all Mississippi voters have the ability to exercise their fundamental right to vote in the midst of an unprecedented public health crisis and prevent disenfranchisement of properly cast ballots.  "The fundamental right to vote is one of the cornerstones of our democratic society . . . [t]he threatened deprivation of this fundamental right can never be tolerated."  *Murphree v. Winter*, 589 F. Supp. 374, 382 (S.D. Miss. 1984) (finding that granting a preliminary injunction requiring access to absentee ballot would "clearly . . . not disserve the public interest."); Further, the public interest also "lies with safeguarding public health."  *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013).

## V.      THE BALANCE OF EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION

The balance of equities weighs heavily in favor of an injunction.  Plaintiffs seek injunctive relief approximately two months in advance of the November election, giving Defendants time to address administrative issues (if any) and communicate to citizens and election officials.

Defendants will face little if any harm from construing the Excuse Requirement to include those voters who reasonably fear that voting in person will increase their risk of exposure to

COVID-19.  On the other hand, if the Excuse Requirement is not construed so as to permit individuals who reasonably fear that voting in person will increase their risk of exposure to COVID-19 to vote by absentee ballot, voters will be forced to choose between voting in person on Election Day and risking their health, or not voting at all.  The equities favor Plaintiffs.

With respect to the Notarization Requirement, is no evidence that it will advance the State's interest in protecting against fraud.  *See Thomas*, 2020 WL 2617329, at *21; *see also* Meredith Decl. ¶ 59.

Finally, with respect to the Cure Prohibition, implementation of procedures to provide absentee voters with notice and an opportunity to cure for signature-related errors would impose only a minimal burden on th-e state.  On the other hand, Plaintiffs and Plaintiffs' members otherwise face the prospect of deprivation of their right to vote and due process.

## CONCLUSION

For the reasons stated herein, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

*/s/ Jade Morgan*

Jade Morgan
MS Bar No. 105760
Leslie Faith Jones*
SOUTHERN POVERTY LAW
CENTER
111 E. Capitol Street, Suite 280
Jackson, MS 39201
P: (601) 317-7519
F: (601) 948-8885
jade.morgan@splcenter.org
leslie.jones@splcenter.org

Caren E. Short*
Nancy G. Abudu*
SOUTHERN POVERTY LAW

CENTER
P.O. Box 1287
Decatur, GA 30031
P: (404) 521-6700
F: (404) 221-5857
caren.short@splcenter.org
nancy.abudu@splcenter.org

Ezra D. Rosenberg*
Jennifer Nwachukwu*
Ryan Snow*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Phone: (202) 662-8600
Fax: (202) 783-0857

Neil A. Steiner*
Sharon Turret*
Pat Andriola*
Tomas Barron*
DECHERT LLP
1095 6th Avenue
New York, NY 10036
Phone: (212) 698-3500
Fax: (212) 698-3599
Julia Chapman*
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2000
Fax: (215) 994-2222

*Pro hac vice motion forthcoming

**Attorneys for Plaintiffs**

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify on this 17th day of September, 2020, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF System.

                */s/ Jade Morgan*   
                Jade Morgan, Esq.

Dated:  September 17, 2020